The BALDEWEIN COMPANY, Plaintiff-Appellant,

v.

TRI-CLOVER, INC., Defendant-Appellee.

Supreme Court

*No. 99–0541–CQ. Oral argument September 9, 1999.—Decided February 29, 2000.*

## 2000 WI 20

(Also reported in 606 N.W.2d 145.)

For the plaintiff-appellant there were briefs by *Michael Spurlock, Eric W. Beery* and *Beery & Spurlock Co., L.P.A.*, Columbus, OH and *W. Stuart Parsons, Daniel Janssen* and *Quarles & Brady*, Milwaukee and oral argument by *Richard A. Westley & Eric Beery*.

For the defendant-appellee there was a brief by *Charles P. Graupner, Joshua L. Gimbel* and *Michael Best & Friedrich, LLP*, and oral argument by *Charles P. Graupner*.

¶ 1. DIANE S. SYKES, J. This case is before the court on certification from the United States Court of Appeals for the Seventh Circuit pursuant to Wis. Stat. § 821.01 (1997–98) and Circuit Rule 52. The essential question is: when is a dealership "situated in this state" under Wis. Stat. § 135.02(2),[1] thereby entitling the dealer to protection under the Wisconsin Fair Dealership Law (WFDL)?[2] Based upon the language of the statute, as well as its history and purposes, we adopt a test similar to the multiple factor test advanced

[1] Wisconsin Stat. § 135.02(2) provides: " 'Dealer' means a person who is a grantee of a dealership situated in this state."

[2] The Seventh Circuit certified two questions to this court:

1) Does the definition of dealer provided by Wis. Stat. § 135.02(2) include a substantiality requirement? And

in *Ziegler Co. v. Rexnord, Inc.*, 139 Wis. 2d 593, 606, 407 N.W.2d 873 (1987), which considers the dealership's total involvement and investment in promoting and selling the grantor's products or services in the State of Wisconsin.

¶ 2. This case arises out of the termination of a 56-year relationship between the Baldewein Company (Baldewein) and Tri-Clover, Inc. (Tri-Clover). Baldewein is an Illinois corporation with its principal place of business in Franklin Park, Illinois. Baldewein sells sanitary pumps, valves, fittings, and tubing for use in the food, dairy, and pharmaceutical industries. From 1940 until 1996, Baldewein was a distributor for Tri-Clover, a manufacturer of fittings, valves, pumps, and tubing. Tri-Clover is a Delaware corporation with its headquarters, distribution center, and principal place of business in Kenosha, Wisconsin.

¶ 3. Baldewein and Tri-Clover operated under oral agreements for most of their relationship. On May 24, 1985, the two entered into a written distributor agreement that amended the terms of the previous oral agreements and provided that Wisconsin law would

---

2) If there is a substantiality requirement, is the evidence in the record insufficient as a matter of law to establish substantiality?

The Seventh Circuit invited this court to reformulate the questions if "[we] feel that it would be helpful to do so." We believe that the reformulated question posed above more accurately reflects the question the court must address in this case.

We do not address the second question because we find that a court must consider a multitude of factors to determine whether a dealership is situated in this state for purposes of the WFDL, and the record before us is not adequately developed to properly apply the test. Instead, we remand the cause to the Seventh Circuit.

govern the relationship. The agreement granted Baldewein a nonexclusive right to promote and sell Tri-Clover products in a territory consisting of Baldewein's "normal marketing area," which included the entire United States and several foreign countries. Although Tri-Clover was later purchased by the Alfa-Laval Group, the agreement appears to have been unaffected by the change in Tri-Clover's ownership, and the parties continued to operate under it until Tri-Clover terminated the relationshp in June 1996.

¶ 4.　Prior to the termination, Baldewein derived some 80 to 90 percent of its total revenue from the sale of Tri-Clover's products. The vast majority of that business, however, was conducted outside the State of Wisconsin, primarily in Illinois, where Baldewein was headquartered. In fact, based upon sales figures from both Baldewein and Tri-Clover, the district court concluded that although Baldewein always had *some* Tri-Clover sales in Wisconsin, for at least the first 51 years of the parties' relationship, over 99 percent of Baldewein's Tri-Clover sales took place outside this state.

¶ 5.　Between 1992 and 1996, when the relationship was terminated, Baldewein's Wisconsin sales of Tri-Clover products were showing slight increases, averaging between 3.9 and 4 percent of its total annual Tri-Clover sales during those years. This development appears to have coincided with the hiring of two Wisconsin residents who solicited sales for Baldewein in this state. It is not clear, however, whether these salespeople devoted all of their time to developing the Wisconsin market for Baldewein's Tri-Clover product line, or whether Wisconsin was only part of their assigned territory. At no time did Baldewein ever have

an office, warehouse or other facility in Wisconsin, or invest in any physical plant or inventory in this state.

¶ 6. During the fiscal years 1993–1995, Baldewein spent approximately $40,000 per year on advertising. It is not clear from the record, however, how much of this advertising budget was devoted exclusively to Wisconsin or could be apportioned in some pro rata way to the development of the Wisconsin market. Nor is there any indication of how much Baldewein spent on advertising in the years prior to 1993, either generally or in Wisconsin in particular. There is a reference in the record to "advertising and mailings" being sent to some 111 customers and prospective customers in Wisconsin, but it is not specific as to time.

¶ 7. On June 29, 1996, Tri-Clover changed its nationwide distribution system and terminated its relationship with Baldewein. In March 1997, Baldewein brought a diversity suit in the United States District Court for the Eastern District of Wisconsin, claiming damages under the Wisconsin Fair Dealership Law. Tri-Clover counterclaimed, seeking damages based upon Baldewein's failure to pay for products it had purchased on account.

¶ 8. Both parties filed cross-motions for summary judgment. The district court, the Honorable Rudolph T. Randa, granted Tri-Clover's motion, relying on *Swan Sales Corp. v. Joseph Schlitz Brewing Co.*, 126 Wis. 2d 16, 374 N.W.2d 640 (Ct. App. 1985) and an unpublished federal district court opinion, *Lewis Communications v. Athletic Business Publications*, No. 97–C–132–S (W.D. Wis. Oct. 7, 1997). Judge Randa determined that in order to be "situated in this state" within the meaning of the WFDL, a dealership must have some meaningful connection with this state, as

represented by a "not-insignificant amount of sales in Wisconsin compared to its overall sales" of the grantor's products. *Baldewein Co. v. Tri-Clover, Inc.*, No. 97–C–213, slip op. at 19 (E.D. Wis. Mar. 9, 1998).

¶ 9.   Judge Randa concluded that to hold otherwise would mean "any nationwide or worldwide dealership could obtain for itself the protections of the WFDL by the simple trick of a Wisconsin choice-of-law provision and a single sale to the State." *Baldewein*, slip op. at 15. He found that Baldewein's sales of Tri-Clover products in Wisconsin, which at no time were greater than 7.3 percent and which averaged 3.5 percent to 4 percent of its total Tri-Clover sales in the last five years of the parties' relationship, were not sufficient to qualify Baldewein as a dealership "situated in this state" under the WFDL.

■

¶ 10.   Baldewein appealed the district court's decision to the United States Court of Appeals for the Seventh Circuit. The Seventh Circuit certified the case to us to interpret the "situated in this state" language in the statute. We are therefore presented with a question of law, which we review independently. Although we are not bound by the federal court's interpretation of Wisconsin law, *Daanen & Janssen, Inc. v. Cedarapids, Inc.*, 216 Wis. 2d 395, 400, 573 N.W.2d 842 (1998), it is nonetheless helpful to our analysis.

■

¶ 11.   In any case of statutory interpretation we must give effect to the intent of the legislature. *Matter of Sullivan*, 218 Wis. 2d 458, 464, 578 N.W.2d 596 (1998). We first look for that intent in the language of the statute itself. If we find that the language of the statute is ambiguous, we will look beyond it to the scope, history, context, subject matter, and object of the

statute. *State ex rel. Jacobus v. State*, 208 Wis. 2d 39, 47, 559 N.W.2d 900 (1997). A statute is ambiguous if it is capable of being understood by reasonably well-informed persons in more than one way. *Id.*

¶ 12.   The statutory definition of a "dealer" appears, on its face, to be quite simple: a "dealer" is "a person who is a grantee of a dealership situated in this state." Wis. Stat. § 135.02(2). The definition of a "dealership," on the other hand, is more complicated and is both extremely broad and highly nuanced:

> 'Dealership' means *a contract or agreement,* either express or implied, whether oral or written, between 2 or more persons, by which a person is granted the right to sell or distribute goods or services, or use a trade name, trademark, service mark, logotype, advertising or other commercial symbol, *in which there is a community of interest* in the business of offering, selling or distributing goods or services at wholesale, retail, by lease, agreement or otherwise.

Wis. Stat. § 135.02(3)(emphasis added).

¶ 13.   "Community of interest" has been the most vexing phrase in the dealership definition for courts faced with applying this law. Our decision in *Ziegler*, 139 Wis. 2d at 606, established a multiple factor test that provides some contours for the concept. The "situated in this state" language has also been an interpretive challenge.

¶ 14.   The only state court authority about the meaning of the "situated in this state" requirement is *Swan*, 126 Wis. 2d at 20–22. *Swan* held that the language was ambiguous because "a reasonably well-informed person might interpret it to mean either that

the grantee (dealer) must be located in Wisconsin or that the dealership must be situated in Wisconsin." *Id.* at 21.

¶ 15.   Having found an ambiguity, the *Swan* court consulted the legislative history of the statute, tracing the "situated in this state" language to a 1977 effort to amend the WFDL to limit its application to Wisconsin dealers. *Id.* 21–22. This was a legislative response to two federal cases, *C.A. May Marine Supply Co. v. Brunswick Corp.*, 557 F.2d 1163 (5th Cir. 1977) and *Boatland, Inc. v. Brunswick Corp.*, 558 F.2d 818 (6th Cir. 1977), which had applied the WFDL to non-Wisconsin dealers operating under agreements containing Wisconsin choice-of-law provisions. *See Diesel Serv. Co. v. AMBAC Int'l Corp.*, 961 F.2d 635, 638 (7th Cir. 1992).

¶ 16.   The *Swan* court concluded that the 1977 amendment adding the "situated in this state" language clearly established "the legislature's intent to make the WFDL apply exclusively to dealerships that do business within the geographic confines of the state of Wisconsin." *Swan*, 126 Wis. 2d at 22. The "doing business within Wisconsin" test articulated in *Swan* set off a disagreement in the federal courts about how much business in this state is enough to qualify.[3]

---

[3] *See CSS-Wisconsin Office v. Houston Satellite Sys. Inc.*, 779 F. Supp. 979 (E.D. Wis. 1991)("situated in this state" requirement satisfied as long as dealership conducts *some* business in Wisconsin; thus an Indiana corporation that made an unspecified number of sales in this state merited protection of WFDL); *Diesel Serv. Co. v. AMBAC Int'l Corp.*, 961 F.2d 635 (7th Cir. 1992)(WFDL applies to dealerships that do some business in state, including a Minnesota dealer which made 34 percent of its sales of the grantor's products in Wisconsin);

¶ 17.   The facts of the *Swan* case did not help delimit the new test at all, since the putative dealer in that case did no business here; although it was physically located in this state, it was authorized to sell the grantor's products only in overseas markets. The *Swan* court simply concluded that under these circumstances, the "subject matter of this agreement is not 'situated in this state.' " *Id.* at 22. And so the problem of the applicability of the WFDL to multi-state dealers operating only partially in Wisconsin remained essentially unresolved, despite *Swan*.

¶ 18.   Part of the problem is purely linguistic. The statute says the "dealership"—not the "dealer"—must be situated in this state, but defines "dealership" as a "contract or agreement," which can hardly be said to be "situated" anywhere, especially since the definition of "dealership" includes both written and oral agreements.[4] Wis. Stat. § 135.02(2) and (3). The *Swan* court said the "dealership" must do business within the geo-

---

*Lewis Communications v. Athletic Bus. Publications*, No. 97–C–132–S, slip op. at 15 (W.D. Wis. Oct. 7, 1997)(dealers must establish more than a de minimis connection with Wisconsin to be entitled to protection under WFDL; therefore, a California dealership that made some sales, but provided no evidence of the extent of dealership activities in Wisconsin, was not situated in this state); *Baldewein Co. v. Tri-Clover, Inc.*, No. 97–C–213, slip op. at 16, 20 (E.D. Wis. Mar. 9, 1998)(dealer must meet some minimum level of sales in Wisconsin over the course of the entire relationship in order to justify application of the WFDL; thus dealer that never made more than seven percent of its sales in this state was not protected).

[4] A written contract could conceivably be "situated" somewhere in a literal sense, but an interpretation of the statute that focused on the physical location of the document itself would be nonsensical. An oral contract or agreement clearly cannot be "situated" anywhere.

graphic confines of this state, but this is impossible, since (here we are again) a "dealership" is a "contract or agreement," which cannot "do business" at all, only "dealers" can. So we agree, at least, with the *Swan* court's conclusion that there is an ambiguity here, and turn to the statute's history, context, and purpose to help us interpret its language.

¶ 19. Prior to the enactment of the WFDL in 1974, Wisconsin had no regulatory scheme protecting dealerships or franchises, and so the matter was left entirely to contract between the parties. *California Wine Ass'n v. Wisconsin Liquor Co.*, 20 Wis. 2d 110, 121 N.W.2d 308 (1963). The oil embargo of 1973, and the strain it placed on state gasoline retailers, prompted the legislature to revive previous attempts to pass comprehensive dealer protection legislation. Michael A. Bowen & Brian E. Butler, *The Wisconsin Fair Dealership Law* § 1.3(2d ed. 1998). The WFDL was signed into law in April of 1974.

¶ 20. As originally enacted, the WFDL did not contain the "situated in this state" requirement. That language was added in 1977, as noted above, in response to the *C.A. May Marine* and *Boatland* cases, which had applied the WFDL to protect dealers operating entirely out of state based solely on Wisconsin choice-of-law provisions in the dealership agreements.

¶ 21. The legislature amended the WFDL to prevent similar applications of the WFDL in the future. *Diesel Serv.*, 961 F.2d at 638. One option considered and ultimately rejected was a change in the definition of "dealership" to mean "a contract. . .by which a person in this state is granted the right to sell or distribute goods." *Swan*, 126 Wis. 2d at 21–22. Instead, the legislature focused on the definition of "dealer," amending it

to include only "dealership[s] situated in this state." *Id.* at 22.

¶ 22.   The *Swan* court concluded from this legislative history and the juxtaposition of terms that the phrase "situated in this state" modifies "dealership" rather than "dealer." *Id.* We agree. We note that the legislature's rejection of the "person in this state" language and adoption of the phrase "dealership situated in this state" is evidence that it wanted the focus to be on the substance of the dealership, not the location of the dealer. A "dealership" under the law is not a person or a partnership or a corporation.[5] *See* Wis. Stat. § 135.02(3). A "dealership" is a "contract or agreement," generally between a supplier and a reseller, which is characterized by the "community of interest" concept embodied in the law. *Id.* In other words, a "dealership" is a contract or agreement establishing a particular sort of commercial relationship, defined in such a way as to "encompass an extraordinarily diverse set of business relationships not limited to the traditional franchise." *Ziegler*, 139 Wis. 2d at 602. And so the focus of the analysis must be on whether the business relationship at issue can be said to be situated in this state.

¶ 23.   As we made clear in *Ziegler*, the "community of interest" concept serves to limit the application of the WFDL and requires a person seeking the protections of the law "to demonstrate a stake in the

_____

[5] That would be too easy. The location of a person or a partnership or a corporation is generally readily ascertainable. But nothing has been easy in the interpretation of the WFDL's scope and reach, a task that has fallen mostly to the federal courts sitting in diversity.

relationship large enough to make the grantor's power to terminate, cancel or not renew a threat to the economic health of the person (thus giving the grantor inherently superior bargaining power)." *Id.* at 605. Similarly, the "situated in this state" concept limits the application of the WFDL to commercial relationships that exist in some substantial way in this state (and otherwise satisfy the definition in the statute).

¶ 24. This interpretation of the statutory language is consistent with the stated purposes and policies of the WFDL. Wisconsin Statutes § 135.025(1) provides that the WFDL is to be "liberally construed and applied to promote its underlying remedial purposes and policies." Those policies are: 1) to promote the public interest in fair business relations between dealers and grantors; 2) to protect dealers from unfair treatment by grantors, who inherently have superior economic power and superior bargaining power in the negotiation of dealerships; 3) to provide dealers with rights and remedies in addition to those existing by contract or common law; and 4) to govern all dealerships to the full extent consistent with the constitutions of the state and the United States.[6] Wis. Stat. § 135.025(2).

---

[6] We note, as the Seventh Circuit has, that any "extraterritorial application of the WFDL would, at the very least, raise significant questions under the Commerce Clause." *Morley-Murphy Co. v. Zenith Elecs. Corp.*, 142 F.3d 373, 379 (7th Cir. 1998). Although the issue is not directly present in this certification, Baldewein's counsel implicitly acknowledged the potential constitutional problem when he suggested in oral argument that the "Wisconsin sales" test established by the district court might be appropriate in considering the measure of damages in multi-state dealer cases such as this. The suggestion essentially was that the problems associated with applying the WFDL to

¶ 25. A dealership is a symbiotic relationship. The dealer benefits by generating income through sales, without having to undertake the expense of manufacturing. The grantor benefits by having the dealer undertake important marketing functions through investment in inventory, receivables and facilities, and by applying its efforts and experience in merchandising and selling the product.

¶ 26. The WFDL protects dealers who have made a substantial investment in the dealership and who are substantially dependent on the grantor's product line. *Ziegler*, 139 Wis. 2d at 605. The statute's requirement of a "community of interest" between the parties captures this concept and ensures that the WFDL's protections apply only to those business relationships that involve a higher level of financial interdependence than the typical vendor-vendee relationship. *Id.* at 604–05.

¶ 27. When a dealer sinks substantial resources into its relationship with a particular grantor—time, money, employees, facilities, inventory, advertising, training—or derives substantial revenue from the relationship (as a percentage of its total), or some combination of the two, the grantor's power to terminate, cancel, or not renew the relationship becomes a substantial threat to the economic health of the dealer and a community of interest can be said to exist. When a substantial part of this investment is made in Wisconsin, or the dealer's Wisconsin sales of the grantor's products account for a substantial percentage of the

dealers operating largely out of state can be solved by limiting recovery to lost profits associated only with the Wisconsin market. We do not specifically address the constitutional issue, however, as it is not directly before us.

dealer's total sales of the grantor's products, or some combination of the two, the dealership relationship can be said to be situated here within the meaning of the WFDL.

¶ 28. The district court recognized the importance of a meaningful connection to Wisconsin in order to justify the application of the WFDL to a multi-state dealership. It adopted a "sufficiency of Wisconsin sales" test to determine that Baldewein's dealership was not situated in this state. We agree that Wisconsin sales are an important factor in determining whether a dealership is situated here. However, since the focus of the analysis is on the Wisconsin portion of the dealership relationship, broadly defined, the inquiry must extend beyond just Wisconsin sales. It must involve an analysis of the totality of the dealership investment that is specialized to the marketing of the grantor's products in this state; in other words, the amount of money and other resources the dealer has sunk into the development of the Wisconsin market, in addition to the amount of sales or revenue the dealer derives from this state.[7]

¶ 29. In *Ziegler*, we declined to create a minimum percent-of-sales test for determining whether a "community of interest" exists under the WFDL. *Ziegler*, 139 Wis. 2d at 602. Similarly, we decline to create a

---

[7] The district court's decision to require a minimum level of Wisconsin sales is logical and consistent with the history of the "situated in this state" language and the factual realities of these cases; it just does not take the analysis quite far enough. We agree with the district court's observation that the legislature cannot have intended to permit dealers to invoke the protections of the WFDL by a single sale or minimal sales into this state. The "situated in this state" language was adopted to close an applicability loophole, not open it wider.

minimum percent-of-sales test for determining whether a dealership is situated in this state.[8] We recognize, however, that Wisconsin sales percentages are highly significant to the analysis. In many cases, the dealer's level of sales in Wisconsin may be the single most influential factor in determining whether the dealership is situated here.[9] However, as in the "community of interest" analysis, other factors indicative of an investment in the dealership relationship, and more particularly, other factors indicative of an investment in the relationship in Wisconsin, are also part of the "situated in this state" equation.

¶ 30.   The multiple factor "community of interest" test in *Ziegler* can be adapted to this inquiry and is consistent with the legislative intent to protect investments in dealership relationships when the dealer makes a substantial investment in the Wisconsin mar-

[8] Accordingly, we do not address Baldewein's argument that the district court's "percentage of sales" test violates both the Wisconsin and United States Constitutions.

[9] This is consistent with the post-*Ziegler* reality that courts and counsel in WFDL cases often look to sales or revenue figures first to determine whether a community of interest exists. For "community of interest" analysis, the higher the percentage of overall sales or revenue generated from the grantor's products, the less important the other indicators of "investment" become, because the loss of a significant sales- or revenue-generating product line is more easily seen as a threat to the economic health of the dealer. For "situated in this state" analysis, the higher the percentage of Wisconsin sales or revenues generated from the grantor's products, the less important the other indicators of "investment" become, because a substantial level of sales activity in this state is more easily seen as indicative of a substantial investment in and reliance upon the Wisconsin market.

ket, measured by facilities, inventory, employees and the like, or when the dealer derives a substantial percentage of its total sales or revenues from Wisconsin, or some combination of the two. Therefore, to determine whether a dealership is "situated in this state" under the WFDL, courts should examine the following factors: 1) percent of total sales in Wisconsin (and/or percent of total revenue or profits derived from Wisconsin); 2) how long the parties have dealt with each other in Wisconsin; 3) the extent and nature of the obligations imposed on the dealer regarding operations in Wisconsin; 4) the extent and nature of the grant of territory in this state; 5) the extent and nature of the use of the grantor's proprietary marks in this state; 6) the extent and nature of the dealer's financial investment in inventory, facilities, and good will of the dealership in this state; 7) the personnel devoted to the Wisconsin market; 8) the level of advertising and/or promotional expenditures in Wisconsin; and 9) the extent and nature of any supplementary services provided in Wisconsin.[10] We do not intend this list to be all-inclusive. The inquiry should focus on the nature and extent of the dealership's development of, investment in and reliance upon the Wisconsin market.

---

[10] By adapting the *Ziegler* "community of interest" test to the interpretation and application of the "situated in this state" requirement of the WFDL, we do not mean to suggest that the latter inquiry henceforward shall subsume the former. There will, of course, be cases in which multi-product line, multi-state dealers sue under the WFDL and will have to demonstrate a sufficient "community of interest" under *Ziegler* to meet the definition of "dealership" before any inquiry is made into whether enough of that "community of interest" exists in Wisconsin for the dealership to be "situated" here within the meaning of the statute.

¶ 31.  It should be noted that the location of the grantor is not one of the factors we have listed. Baldewein argues that since Tri-Clover is headquartered in Kenosha, and risk of loss passed in Kenosha, 100 percent of its sales can be considered to have been made in Wisconsin, and thus the WFDL should apply. We disagree. The location of the grantor's business and the passing of risk have nothing to do with the policies underlying the WFDL. The law focuses on protecting investments in dealership relationships in Wisconsin; the location of the grantor is irrelevant to the analysis of whether a substantial investment has been made here or a substantial percentage of sales occurs here, or some combination of the two, so that the law's protections come into play. Any interpretation to the contrary would punish Wisconsin manufacturers for locating their facilities in this state, a result that the legislature can hardly have intended.

¶ 32.  Furthermore, it is abundantly clear that a Wisconsin choice-of-law provision will not operate to trigger the application of the WFDL. Indeed, choice-of-law provisions in dealership agreements have nothing to do with the "situated in this state" analysis at all.

¶ 33.  We recognize that our adaptation of the *Ziegler* test to the interpretation of the "situated in the state" language in the WFDL does not establish the brightest of demarcation lines between those dealerships that are situated here and those that are not. As with so much else under the WFDL, courts will have to sort out the applicability of this law case by case. But this approach has the best chance of ensuring that the law will be applied to those dealership relationships it was intended to protect, and no others.

¶ 34.  Because the record before us is undeveloped on at least some of the factors that are relevant to

the test we have established, we do not decide whether the evidence is sufficient to conclude that Baldewein is "a grantee of a dealership situated in this state." Therefore, we remand this case to the Seventh Circuit for further proceedings consistent with this opinion.

*By the Court.*—Question answered and cause remanded to the United States Court of Appeals for the Seventh Circuit for further proceedings consistent with this opinion.

¶ 35.  SHIRLEY S. ABRAHAMSON, CHIEF JUSTICE *(concurring).* I write separately to apply the multiple-factor test to the facts of this case. Rather than remand the cause, I conclude that there is sufficient evidence to hold that the dealership in question is indeed "situated in this state," so that the Wisconsin Fair Dealership Law (WFDL) is applicable.

¶ 36.  Two overriding principles govern the applicability of the multiple-factor test to the facts. First, the legislature has declared that the purpose of the WFDL is remedial and has instructed the courts to interpret the law liberally.[1] The legislature has further affirmed that the underlying purpose and policies of the law essentially are to promote fair business relations between dealers and grantors, recognizing that dealers must be protected against unfair treatment by grantors, who inherently have superior economic power and superior bargaining power.[2] Moreover the

---

[1] Wisconsin Stat. § 135.25(1) (1997–98) states:

(1)  This chapter shall be liberally construed and applied to promote its underlying remedial purposes and policies.

All subsequent references to the Wisconsin Statutes are to the 1997–98 version unless otherwise noted.

[2] Wisconsin Stat. § 135.25(2) states:

legislature has provided that the law shall apply to all dealerships to the full extent consistent with the Wisconsin and U.S. constitutions.[3] Thus if the WFDL can constitutionally apply to a dealership, the court should apply it.

¶ 37.   Second, "community of interest" and "situated in this state" are not the same, although similar factors are used to determine both statutory elements. *See* majority op. ¶ 30 at n.10. The multiple factors set forth in the majority opinion are not the exclusive factors to determine "situated in this state."

¶ 38.   The first factor is the percentage of the dealership's total sales in Wisconsin. During 1995 and part of 1996, the last two fiscal years of the dealership's existence before being terminated by Tri-Clover, sales to Wisconsin customers constituted over 7% of Baldewein's sales of Tri-Clover products. When I consider the last five years before termination, from 1992 through 1996, sales to Wisconsin customers constituted about 4% of Baldewein's sales of Tri-Clover products, for a total of over $200,000 in sales. These numbers are significant. Baldewein might be doing business in numerous states with sales of Tri-Clover

---

(2)   The underlying purposes and policies of this chapter are:

(a)   To promote the compelling interest of the public in fair business relations between dealers and grantors, and in the continuation of dealerships on a fair basis;

(b)   To protect dealers against unfair treatment by grantors, who inherently have superior economic power and superior bargaining power in the negotiation of dealerships;

(c)   To provide dealers with rights and remedies in addition to those existing by contract or common law;

(d)   To govern all dealerships, including any renewals or amendments, to the full extent consistent with the constitutions of this state and the United States.

[3] Wisconsin Stat. § 135.25(2)(d).

78

products constituting 4% – 7% of its sales in each of the states. If each of those states had a fair dealership law like Wisconsin's, accepting Tri-Clover's position would mean that no state fair dealership law governs the dealership. This result cannot be correct.

¶ 39.   The second factor listed is the length of the parties' dealings in Wisconsin. This factor strongly favors a finding that the WFDL applies to this dealership. The parties had a dealership relationship for 56 years, beginning in 1940, and Wisconsin sales were solicited and made every year.

¶ 40.   The third factor identified is the extent and nature of the obligations imposed on the dealer regarding operations in Wisconsin. The record indicates that the dealership imposed significant requirements on Baldewein, including a minimum amount of annual sales of Tri-Clover products and maintenance of a minimum amount of Tri-Clover goods in stock at all times.

¶ 41.   The fourth factor is the extent and nature of the grant of territory in Wisconsin. Tri-Clover granted Baldewein the non-exclusive right to distribute Tri-Clover goods throughout the entire state of Wisconsin.

¶ 42.   The fifth factor is the extent and use of Tri-Clover's proprietary marks. Baldewein appears to have done significant advertising with Tri-Clover's name and corporate logo. Baldewein submitted into evidence copies of its ads in the Chicago Yellow Pages indicating that Baldewein carried Tri-Clover's products. The president of Baldewein, Valentin Baldewein, stated in his affidavit that he believed that these Yellow Pages are distributed in some parts of Wisconsin. In addition, Baldewein sent a calendar each year to its customers that showed Tri-Clover's logo and stated that Baldewein was an "authorized dealer" of Tri-Clover goods. Baldewein also sent solicitation letters to cus-

tomers and potential customers that stated, near the beginning of the letter, "As we are the oldest stocking distributor of Tri-Clover equipment. . . ." The exact number of these letters sent to Wisconsin customers is not known.

¶ 43.   The sixth factor is the extent and nature of Baldewein's financial investment in inventory, facilities, and good will in the state. Tri-Clover emphasizes that Baldewein never maintained an office in Wisconsin. However, Baldewein did purchase all of Tri-Clover's goods "free on board" in Wisconsin and therefore the risk of loss transferred to Baldewein in Wisconsin.[4] Furthermore, Baldewein employees on occasion traveled to Tri-Clover's office in Kenosha, Wisconsin, to pick up shipments. Baldewein's vice president also personally visited the Tri-Clover office in Kenosha to attend training sessions and to discuss business.

¶ 44.   The seventh factor is the personnel devoted to the Wisconsin market. Throughout the 1990s Baldewein employed two Wisconsin residents to solicit business and make sales in Wisconsin.

¶ 45.   The eighth factor is the level of advertising in Wisconsin. Baldewein sent advertisements and solicitations to 111 Wisconsin customers, largely promoting Tri-Clover products. The president of Baldewein owned a home in Wisconsin during the 1980s and personally solicited Wisconsin customers.

---

[4] Based on this fact and the fact that Wisconsin law governed the transactions between the parties, Baldewein argues that all the sales between the parties should be considered "Wisconsin sales," even if they were eventually sold by Baldewein in other states. This argument is rejected.

¶ 46.    Regarding the ninth factor, we do not have evidence about supplementary services provided in Wisconsin.

¶ 47.    Given that the legislature has directed the WFDL to be applied broadly and to the full extent of Wisconsin's constitutional powers, I conclude that the totality of facts demonstrates that the dealership is "situated in the state" under Wis. Stat. § 135.02(2). The multiple-factor test is properly aimed at excluding dealerships that have a de minimis relation with Wisconsin. Because the dealership in this case had substantial contacts with Wisconsin, the protections of the WFDL should apply.

¶ 48.    For the reasons stated, I concur.