TECHMASTER, INC., Plaintiff,

v.

COMPACT AUTOMATION
PRODUCTS, LLC,
Defendant.

No. 06–C–0626–C.

United States District Court,
W.D. Wisconsin.

Nov. 27, 2006.

Steven M. Streck, Axley Brynelson, Madison, WI, for Defendant.

## OPINION AND ORDER

CRABB, District Judge.

This is a civil suit for injunctive relief and money damages in which plaintiff Techmaster, Inc. charges defendant Compact Automation Products, LLC with breach of duty of good faith and fair dealing, violation of the Wisconsin Fair Dealership Act, Wis. Stat. ch. 135, and tortious interference with a contract. It is before the court on plaintiff's motion for a preliminary injunction prohibiting defendant from selling products directly to a third party, TomoTherapy, rather than through plaintiff, defendant's distributor. Oral argument on the motion took place on November 21, 2006. Pending a decision on the motion for preliminary injunction, the parties are operating under a stipulated extension of a temporary restraining order entered by the Circuit Court for Dane County.

Plaintiff has acted as defendant's distributor for ten years. In that role, plaintiff has not only sold and serviced the

TomoTherapy account but invested time and money into developing a specialized actuator that defendant manufactures for TomoTherapy. As TomoTherapy has grown, the sales of the actuators have increased significantly, bringing both parties sizeable gains in revenues. In plaintiff's version of what happened, the future seemed bright to both parties until defendant decided to shuffle plaintiff out of the way, sell directly to TomoTherapy at a lower price than plaintiff could offer, while refusing to supply the actuators to plaintiff. Plaintiff believes these actions violated the terms of the distributorship agreement and deprived plaintiff of the opportunity to recoup its early investment in the actuator project. Defendant sees its decision to sell directly to TomoTherapy as its only recourse when plaintiff failed to keep it advised of the TomoTherapy's 2007 order and led defendant to believe it was going to find another manufacturer for the TomoTherapy actuators.

I conclude that plaintiff has shown a reasonable likelihood that it could prevail on its claims that the parties' relationship is subject to the provisions of the Wisconsin Fair Dealership Law and that defendant's actions violate that law. I conclude also that plaintiff has shown a likelihood of irreparable harm, that the balance of the harms favors plaintiff and that the public interest would not be disserved by a grant of an injunction. This conclusion makes it unnecessary to address plaintiff's alternative claims of breach of the duty of good faith and fair dealing or tortious interference with a contract.

Jurisdiction is present. The parties appear to be citizens of different states and the amount in controversy exceeds $75,000. Venue is proper also. Although the parties agreed that any legal proceeding relating to their agreement would be litigated in a South Carolina court, § 135.025 of the Wisconsin Fair Dealership Law provides that the effect of the act "may not be varied by contract or agreement. Any contract or agreement purporting to do so is void and unenforceable to that extent only." To the extent that this case arises arguably under the fair dealership law, it is properly in this court.

From the facts proposed by the parties, I find for the sole purpose of deciding this motion that the following are not in dispute.

## UNDISPUTED FACTS

Plaintiff Techmaster, Inc. is a Wisconsin corporation with its principal place of business in Wisconsin. It is a distributor of automation, fluid power and motion control products used in Wisconsin. Defendant Compact Automation Products, LLC, is a Delaware limited liability company whose sole member is not a Wisconsin corporation and does not have its principal place of business in Wisconsin. It is a manufacturer of automation products, such as small bore and hollow rod cylinders, grippers and slides. (At this stage of the proceedings, I will accept these assertions as sufficient to find jurisdiction under 28 U.S.C. § 1332. To avoid any questions, the parties should advise the court promptly of the citizenship of the sole member of the limited liability company and the location of its principal place of business. If defendant knows enough to say that neither the citizenship or the principal place of business is in Wisconsin, it knows enough to tell the court the names of the states of which the member is a citizen and in which it has its principal place of business.)

Plaintiff has been a distributor for defendant and its predecessor companies for the last ten years. At the present time, plaintiff distributes products manufactured by defendant pursuant to an "Agreement for Strategic Alliance," which the parties

entered into in November 2001 and which grants plaintiff a sales territory encompassing the state of Wisconsin and identifies the parties' mutual goal as the expansion of the distribution of defendant's products within plaintiff's distribution territory. Since 1999, plaintiff has been defendant's only distributor in Wisconsin.

Under the distribution agreement, plaintiff agrees to devote its best efforts to the distribution and promotion of defendant's products and to forgo distributing competitive products in exchange for the right to sell defendant's products to customers. The agreement requires plaintiff to maintain an adequate office and place of business for the display and sale of defendant's products and maintain an adequate inventory, including a suitable supply of spare parts. Plaintiff is to meet with defendant annually and provide semi-annual reports describing its sales effort and keep defendant advised in writing of its forecasted product requirements, based on plaintiff's good faith estimates. The parties agreed that their "new relationship presents a solution reliant upon a 'partnering' of each other's efforts and resources and will be best implemented through this Partnering for Growth Program."

Section 2–1 of the distribution agreement provides:

[Defendant] hereby grants to Distributor, subject to the provisions of Section 2–2 hereof, the non-exclusive right to sell [defendant's] Products throughout the Territory. [Defendant] shall have the right to appoint additional distributors in the Territory if required, in [defendant's] sole judgment, to meet the needs of the Territory. Distributor hereby accepts such grant. It is expressly understood that [defendant] retains the right to aggressively pursue direct sales opportunities with prospective customers in the Territory. It is [defendant's] intent to develop sales and business in the Territory with prospective customers that are not currently purchasing [defendant's] Products from Distributor, in accordance with the provisions of Section 4–1(a). Further, if [defendant] determines, in its sole judgment, that the needs of particular customers best would be served by direct purchases from [defendant], or if a particular customer insists on direct purchases from [defendant], [defendant] shall be entitled to make sales to such customer directly. In any instance in which [defendant] makes a direct sale to a customer in the Territory, [defendant] may elect, at its sole discretion, to pay a commission to Distributor on such sale. The amount of any such commission may be established by [defendant] on a case-by-case basis, considering various factors, including but not necessarily limited to, the amount of the sale, [defendant's] profit on the sale, the time, if any, expended by Distributor in assisting [defendant] in obtaining the sale, and the anticipated service to be supplied by Distributor to the customer.

Section 6–1 provides as follows:

From time-to-time, [defendant] may, as a result of Distributor's efforts, make sales of Products directly to Distributor's customers in the Territory or to [defendant's] direct sales customers within the Territory. Where this occurs, [defendant] shall pay Distributor a commission on such sales (the "Commission"). The Commission shall be based upon the actual sale price of the Products to such a customer and shall be paid at a rate to be negotiated by [defendant] and Distributor on a case-by-case basis. For purposes of this Agreement, "actual sale price" means the invoice price for such Products, including any discount granted by [defendant], but shall not include charges such as packing, shipping and mailing costs, taxes

and insurance. Also excluded from "actual sale price" shall be all non-recurring charges, such as tooling, engineering, qualification testing, and all other software, shipping and mailing costs, taxes, and insurance. No Commission shall be due or payable for sales of Excluded Products within the Territory.

The parties have never negotiated a commission.

In 1997, plaintiff's sales of defendant's products reached approximately $100,000. In 2006, plaintiff has sold more than $1,670,000 worth of defendant's products. Sales of defendant's products now represent approximately 23% of plaintiff's yearly revenues and about 25% of plaintiff's yearly profits. Since 2004, plaintiff has been one of defendant's three largest distributors. In 2005, plaintiff was the largest single distributor of defendant's products.

TomoTherapy, Inc. is a medical device manufacturer located in Madison, Wisconsin. Beginning in 1998, plaintiff's sales-engineer, Christopher Howell, participated with TomoTherapy and defendant in the engineering and design of a custom actuator to be manufactured by defendant for use in TomoTherapy products. The process of developing the Tomo actuator took about three years before TomoTherapy purchased a prototype for testing and at least another year before TomoTherapy began purchasing the actuator. Defendant recognized Howell's contribution to the design and development of the actuator and to TomoTherapy business with an outstanding achievement award in 2004.

The Tomo actuator is used exclusively by TomoTherapy and is the only one of defendant's products that TomoTherapy has purchased. The actuator is a necessary custom-manufactured part in TomoTherapy's products, including the TomoTherapy Hi●Art System®.

Since the end of 2004, TomoTherapy has issued a single "blanket purchase order" to plaintiff for the actuators it anticipates it will need during the following year. The blanket purchase order allows TomoTherapy to benefit from a reduced price because of the volume of product ordered and insures that defendant will have the supply required for its manufacturing needs. In 2005, TomoTherapy purchased Tomo actuators under a blanket purchase order issued in 2004. In 2005, TomoTherapy issued a blanket purchase order to plaintiff for the purchase of 168 Tomo actuators in 2006. That purchase order expires in December 2006.

Because of the relatively large number of pieces ordered by TomoTherapy in its 2006 blanket purchase order, defendant gave plaintiff a discounted price, which it passed on to TomoTherapy. Plaintiff's 2006 year to date sales of the Tomo actuator to TomoTherapy are almost $1,000,000, with a profit of a little more than $300,000. These sales represent 13% of plaintiff's total sales and 14% of its total profits.

In September 2006, TomoTherapy asked plaintiff's employee, Christopher Howell, for a quote from plaintiff for 288 Tomo actuators, a much larger quantity of actuators than TomoTherapy had ever ordered before. This larger order reflects the continuing rapid growth of TomoTherapy. Plaintiff expects TomoTherapy's orders for both the actuators and complementary products sold by plaintiff to increase in the future.

After receiving TomoTherapy's request for a quote, plaintiff asked defendant for a reduced price to purchase the actuators for resale. Initially, defendant told plaintiff that no additional volume discounts would be forthcoming. From its past experience with defendant and from conversations with defendant's employees, plaintiff believed that a new quote could be negotiat-

ed. Meanwhile, plaintiff gave TomoTherapy a quote for the new actuators at a lower price per piece than it had charged for the actuators in 2005. Plaintiff hoped that defendant would provide the actuators at the requested price, but it was prepared to place the order in any event so as to maintain its business relationship with TomoTherapy. TomoTherapy accepted plaintiff's quote and issued a purchase order on September 25, 2006 for approximately $1,641,00 worth of actuators.

On October 9, 2006, Michael Radosevic, plaintiff's president, met with Chris Lee and Patrick Lee, the vice president and president of defendant's parent company, to discuss concerns that plaintiff had about defendant's management. Defendant suggested to Radosevic that it was contemplating making changes in its management team. Defendant offered plaintiff two new product lines for distribution purposes.

On October 17, 2006, plaintiff met with TomoTherapy to discuss the 2007 blanket order. The next day, Radosevic emailed defendant, expressing his concern that an employee of defendant, Ed Wnorowski, had met with TomoTherapy.

On October 20, 2006, Chris Lee wrote Radosevic to tell him that defendant would be selling directly to TomoTherapy under §§ 2–1 and 6–1 of the distribution agreement. Lee asked Rodosevic to confirm that it had "not shared any engineering, design, manufacturing, technical, marketing and pricing information regarding [defendant's] products to third party manufacturers and that [plaintiff had] not directly or indirectly promoted the sale of any products that compete with [defendant's] products to TomoTherapy, Inc."

Defendant did not provide a quote to plaintiff after October 20, 2006. Defendant has told TomoTherapy that it would sell its actuators directly to TomoTherapy.

On October 23, 2006, Radosevic wrote Lee to confirm that the "only other products [plaintiff] is promoting are those that would help to secure [defendant's] business at TomoTherapy" and asked again for the price quote plaintiff had requested previously. On October 24, 2006, Lee responded to Radosevic that defendant was going to directly to TomoTherapy and that he would be talking with Radosevic about a commission for plaintiff.

On October 24, 2006, Radosevic received an email from Lee in which Lee stated that he had not received a reply to his request for confirmation that plaintiff was not promoting competitive products to TomoTherapy. Radosevic responded to Lee that he thought he had responded in his October 23 email but confirmed again that plaintiff has not disclosed proprietary information and is not selling competitive products.

On October 24 or 25, 2006, defendant submitted a quote to TomoTherapy to sell the Tomo actuator directly at approximately 33% less than the price quoted by plaintiff and less than defendant would have charged plaintiff for the actuators. Defendant has told TomoTherapy that it will not fill plaintiff's order for the custom-manufactured product TomoTherapy wants to buy, effectively forcing TomoTherapy to buy directly from defendant.

Never before has defendant sold product directly to plaintiff's existing customers. On its website, defendant states that it does not sell directly to customers but sells through an authorized distributor network. To date, the parties have had no discussions concerning a commission.

Plaintiff filed this suit against defendant in the Circuit Court for Dane County on October 27, 2006. On that same day, a judge of the circuit court entered an ex parte temporary restraining order. The restraining order was extended by stipulation of the parties and order of the court

after defendant removed the case to this court.

Although defendant had emailed plaintiff's president, Radosevic, quoted prices for the TomoTherapy actuators on September 15, 2006, defendant did not receive an additional request from plaintiff for a quote on the Tomo actuators until October 23, 2006. Plaintiff received the TomoTherapy order on September 25, 2006, but did not place the order with defendant until October 31, 2006, when it submitted a purchase order to defendant for 288 Tomo actuators to fill TomoTherapy's order and asked for a prompt acknowledgment of the order. In the normal course of business, defendant acknowledges purchase orders later the same day or the next day. It did not acknowledge the October 31 order.

At some point in the past, defendant began sending a daily open order report to plaintiff so that plaintiff would know that its orders had been received and accepted. Plaintiff has received no daily open order reports since October 31, 2006.

On November 1, 2006, plaintiff sent a follow up email to defendant requesting acknowledgment of the purchase order. No acknowledgment followed. On November 2, plaintiff telephoned defendant but was unable to talk to the person responsible for processing the order. Defendant told plaintiff that the customer service manager would return the call that day, but plaintiff did not hear back from the manager.

Although the Tomo actuator is the only one of defendant's products that plaintiff sells to TomoTherapy, plaintiff sells the company products of other manufacturers as well. Plaintiff has been working on a new business opportunity with TomoTherapy that involves the addition of a special valve to defendant's actuators that would allow TomoTherapy to purchase the valve and actuator as a single unit for incorporation into the Hi●Art System®.

On October 3, 2006, Radosevic emailed Patrick Lee and Chris Lee, stating that "[o]ur largest customer has put us in a position where we must make a decision that I would knew [sic] we would at some point be required to make based on [defendant's] performance since the acquisition of Turn–Act." After receiving this email, defendant's general manager, Ed Wnorowski, talked with Sonia Nail, TomoTherapy's Supply Chain Manager, on or about October 3, 2006.

In an October 3, 2006 meeting, Chris Lee and Patrick Lee offered plaintiff the opportunity to distribute two additional IMC products in an effort to continue the relationship with plaintiff. On October 10, Chris Lee and Patrick Lee sent Radosevic multiple emails offering him the opportunity to distribute additional IMC products. The same day, Radosevic responded by email, stating, "We are at a very critical and precarius [sic] point in our relationship with IMC, and it is imperative that we resolve the issue at hand before we consider expanding it." He added that it appeared from the attached email from Chris Lee that "IMC has made a decision that does NOT involve the removal of the management team that created the adversarial relationship you profess to condemn before the end of the month." He went on to say, "It is only because of the depth and breadth of our relationship with TomoTherapy that [plaintiff] was given the opportunity to find an alternative and not a competitor."

On October 11, 2006, Chris Lee emailed Rodosevic, confirming defendant's commitment to working with plaintiff to provide the best possible services and stating, "We do however, expect the outstanding Tomo order to be placed with [defendant] this week and not continued to be used as a bargaining chip."

Defendant has never provided plaintiff with a 90–day written notice of its deficiencies or a 60–day opportunity to cure those deficiencies.

## DISPUTED FACTS

The parties dispute the role that Chris Howell played in the development of the actuator that is sold to TomoTherapy. They do not agree that, as plaintiff alleges, defendant has delivery, service and quality problems with its products and they disagree about the likelihood that defendant will pay plaintiff a commission if defendant takes over direct sales to TomoTherapy. None of these factual matters is dispositive of the pending motion.

## OPINION

■ Plaintiff has a number of hurdles to overcome before it can obtain preliminary relief. To win a preliminary injunction, it must demonstrate (1) some likelihood of success on the merits; (2) no adequate remedy at law and irreparable harm resulting from the denial of the injunction; (3) the harm it would suffer if denied an injunction would outweigh the harm defendant would suffer if the injunction issues; party resisting the injunction if it is granted; and (4) the public interest would not be disserved if the injunction issued. Each of these showings presents its own obstacles.

### A. *Likelihood of Success*

■ To meet the first requirement for obtaining a preliminary injunction, plaintiff must be able to show that it is likely to succeed in showing that defendant acted in violation of the law when it met with TomoTherapy and negotiated a direct sale of the actuators. To prevail on its claim under the Wisconsin Fair Dealership Law, plaintiff has to show both that its relationship with defendant is one that is protected by the provisions of that law and that defendant's actions either worked a change in the competitive circumstances of the relationship or amounted to a constructive termination of the relationship, requiring defendant to send a notice and give plaintiff an opportunity to cure its alleged deficiencies.

1. *Applicability of Wisconsin Fair Dealership Law to the parties' agreement*

The Wisconsin Fair Dealership Law was enacted to promote fair business relations between dealers and grantors, protect dealers against unfair treatment by grantors and provide dealers with rights and remedies in addition to those existing in contract or at common law. The law defines a dealership as an agreement between two or more persons in which one is granted the right to sell or distribute goods or services, "in which there is a community of interest in the business of offering, selling or distributing goods or services at wholesale, retail, by lease, agreement or otherwise." Wis. Stat. § 135.02(3)(a).

Not surprisingly, the term "community of interest" has engendered considerable judicial discussion. The courts have struggled to pin down the meaning of the term. In *Ziegler Co. v. Rexnord, Inc.*, 139 Wis.2d 593, 604–606, 407 N.W.2d 873, 879–80 (1987), the Supreme Court of Wisconsin identified a number of factors for courts to consider in determining whether the dealer and grantor have a continuing financial interest and interdependence great enough to threaten the financial health of the dealer if the grantor were to exercise its power to terminate the relationship:

how long the parties have dealt with each other; the extent and nature of the obligations imposed on the parties in the contract or agreement between them; what percentage of time or revenue the alleged dealer devotes to the alleged grantor's products of services; what

percentage of the gross proceeds or profits of the alleged dealer derives from the alleged grantor's products or services; the extent and nature of the alleged grantor's grant of territory to the alleged dealer; the extent and nature of the alleged dealer's uses of the alleged grantor's proprietary marks (such as trademarks or logos); the extent and nature of the alleged dealer's financial investment in inventory, facilities and good will of the alleged dealership; the personnel which the alleged dealer devotes to the alleged dealership; how much the alleged dealer spends on advertising or promotion expenditures for the alleged grantor's products or services; the extent and nature of any supplementary services provided by the alleged dealer to consumers of the alleged grantor's products of services.

In *Baldewein Co. v. Tri–Clover, Inc.*, 2000 WI 20, ¶ 27, 233 Wis.2d 57, 606 N.W.2d 145, the state supreme court held that a community of interest can be found "when a dealer sinks substantial resources into its relationship with a particular grantor—time, money, employees, facilities, inventory, advertising, training—or derives substantial revenue from the relationship (as a percentage of its total), or some combination of the two," so that the "grantor's power to terminate, cancel, or not renew the relationship becomes a substantial threat to the economic health of the dealer." The court added that "[t]he 'community of interest' concept serves to limit the application of the WFDL and requires a person seeking the protections of the law 'to demonstrate a stake in the relationship large enough to make the grantor's power to terminate, cancel or not renew a threat to the economic health of the person (thus giving the grantor inherently superior bargaining power)' " *Id.* at ¶ 23 (citing *Ziegler*, at 605, 407 N.W.2d 873).

*Central Corp. v. Research Products Corporation*, 2004 WI 76, 272 Wis.2d 561, 681 N.W.2d 178, made it clear that no summary or distillation of factors is sufficient to permit a court to determine whether a particular business relationship is a protected dealership. The supreme court continues to view the *Ziegler* ten-factor test as critical to the determination of the existence of a dealership. "In *Ziegler*, we stressed the importance of considering all facets of a business relationship, as reflected in the parties' actual dealings, and not limiting the inquiry to one deficient factor." *Id.* at ¶ 33, 407 N.W.2d 873.

In this case, it is a close question whether the parties' relationship constitutes a dealership subject to the protections of the fair dealership law. Factors favoring that conclusion include the ten years the parties have dealt with each other and the relatively extensive obligations imposed on the parties in their agreement, such as the requirements that plaintiff solicit orders for defendant's products vigorously and diligently, exert its best efforts to the promotion, advertisement and marketing of the sales and services of defendant's products to customers and potential customers, provide information concerning developments in plaintiff's sales territory relating to the demand for defendant's products and maintain an adequate office and display space for defendant's products.

Plaintiff has not proposed as fact the percentage of time or revenue it devotes to defendant's products or services. However, it is required to maintain inventory and spare parts, maintain an adequate and properly trained sales organization qualified to sell, service and apply defendant's products, provide regular reports to defendant and meet with it annually, "at least once in the Territory and once at the office of [defendant]." Plaintiff has a defined territory, but does not have exclusivity in the territory. The agreement prohibits plaintiff from carrying products that are

competitive with those manufactured by defendant and requires it to treat as confidential much of the information it receives from defendant. In addition, plaintiff has sunk costs into the development of the TomoTherapy actuators.

Sales of defendant's products constitute 23% of plaintiff's gross sales and 25% of its gross profits for 2006. The sales have been growing steadily in amount and as a percentage of sales since 1997. In 2005, plaintiff was the largest single distributor for defendant's products. Moreover, many of the customers that purchase defendant's products from plaintiff also purchase products of other manufacturers from plaintiff.

Factors militating against a finding of a community of interest include the number of other manufacturers that plaintiff represents (at least 53 and perhaps as many as 81), the fact that sales of the products of these manufacturers amount to more than 75 % of plaintiff's gross profits and the absence of any evidence about plaintiff's investment in office and display spaces (and whether plaintiff would not have these spaces but for the parties' contractual requirement), the size and expense of plaintiff's sales organization and the cost of providing publicity to promote defendant's best interests, as required by the contract.

Taking all of these factors into consideration, I am persuaded that it is at least likely that a reasonable jury would find that plaintiff had proved the existence of a community of interest, with the result that the fair dealership law would apply to the parties' agreement. A jury could find that defendant's power to terminate the dealership or effect a substantial change in its competitive circumstances is a substantial threat to the economic health of the dealer. *Baldewein*, 2000 WI at ¶ 27, 233 Wis.2d at 57, 606 N.W.2d at 150.

## 2. *Violation of the Wisconsin Fair Dealership Law*

It is undisputed that defendant has never provided plaintiff with the statutorily required notice and opportunity to cure. Of course defendant has no duty to comply with those requirements unless it took actions that had the effect of either terminating the relationship between the parties or working a substantial change in competitive circumstances.

Defendant has not advised plaintiff that it wants to terminate the dealership agreement. Thus, the question is whether defendant's refusal to fill plaintiff's order and its decision to take over TomoTherapy's actuator order amount to a constructive termination or a change in competitive circumstances triggering the requirements of notice and opportunity for cure under the fair dealership law. Plaintiff contends that defendant's actions have both effects. In doing so, plaintiff may be acknowledging implicitly that the two are not comfortably distinct. *E.g., Remus v. Amoco Oil Co.*, 794 F.2d 1238, 1240 (7th Cir.1986) ("The provision [in the Wisconsin Fair Dealership Law] about not 'substantially chang[ing]' the competitive circumstances of the dealership' may be intended simply to protect the dealer from 'constructive termination,' that is, against the franchisor's making the dealer's competitive circumstances so desperate that the dealer 'voluntarily' gives up the franchise.") *See also* Michael Bowen & Brian Butler, *The Wisconsin Fair Dealership Law* § 7.5 (2d ed.2005) (suggesting that some actions by a grantor, such as refusing to fill the dealer's orders or advising customers to stop ordering from the dealer, could amount to "an effective end to the commercially meaningful aspects of the relationship, even though the formal contractual relationship between the parties continues in force—in other words, a de facto end to

everything that matters in the relationship, if not to the dealership agreement as such").

For discussion purposes, it makes sense to begin by determining whether defendant's actions constitute a substantial change in competitive circumstances. If the answer is yes, then defendant is in violation of the act and it is not necessary to decide whether the change amounts to a constructive termination of the parties' agreement.

### 3. Change in competitive circumstances

In *The Wisconsin Fair Dealership Law* § 7.11, Bowen and Butler list four prerequisites for a finding of an actionable change in competitive circumstances under § 135.03, which requires good cause for the cancellation of a dealership or effecting a substantial change in competitive circumstances:

1. The action must constitute a *change*, not a continuation of terms of conditions that, however prejudicial to the dealer, have always been part of the relationship.

2. The action must represent a *substantial* change, that is, one affecting the substance of the relationship between the parties....

■ The action must represent a change in *competitive* circumstances. That is, presumably, it must relate to a matter affecting the dealer's ability to compete effectively and not merely to a matter affecting the dealer's overall profitability....

4. The action must represent a change in the competitive circumstances of the dealership *agreement*.

Defendant contends that plaintiff's claim founders at the outset because the parties' agreement provides explicitly for defendant to sell directly to a customer in plaintiff's territory. Plaintiff counters this contention with three arguments: (1) the agreement does not give defendant the right to sell directly to any customer with whom plaintiff has a relationship; (2) the provisions of the agreement that seem to give defendant this right are void because they are too vague to be implemented (and are severable from the rest of the agreement); and (3) even if the provisions are valid, the fair dealership law requires notice and an opportunity to cure whenever a grantor makes a substantial change in the competitive circumstances, whether or not the change is one that the dealership agreement would allow. Because it appears likely that plaintiff can show that the fair dealership law applies to the change defendant is making in the competitive circumstances of the dealership, I will not address plaintiff's first two arguments at this time.

Plaintiff relies on two statutory provisions: Wis. Stat. §§ 135.03 and 135.04. Section 135.03 prohibits grantors from terminating a dealership agreement or making a substantial change in the competitive circumstances of a dealership agreement without good cause. By contrast, § 135.04 requires grantors to give notice of termination or changes in competitive circumstances and makes no reference to "a dealership agreement."

Before 1996, a number of courts had ruled that a grantor did not violate § 135.03 of the fair dealership law by making a substantial change in competitive circumstances if the parties' agreement allowed the change. *E.g., Super Valu Stores, Inc. v. D–Mart Food Stores, Inc.,* 146 Wis.2d 568, 431 N.W.2d 721 (Ct.App. 1988) (when grantor had right to grant franchises without limitation and dealer had no exclusivity right, grantor's decision to grant franchise to another store in dealer's area did not constitute substantial change in competitive circumstances of dealership agreement); *Kinn v. Coast Cat-*

amaran Corp., 582 F.Supp. 682, 684–86 (E.D.Wis.1984) (appointment of another dealer in plaintiff's sales territory does not constitute substantial change in competitive circumstances if dealership agreement gave the plaintiff non-exclusive sales territory); *Brauman Paper Co. v. Congoleum Corp.*, 563 F.Supp. 1, 3–4 (E.D.Wis.1981) (same).

In *Jungbluth v. Hometown, Inc.*, 201 Wis.2d 320, 336, 548 N.W.2d 519 (1996), the state supreme court addressed the question whether § 135.04 allowed grantors to dispense with notice and an opportunity for cure when they terminated a dealership or made a substantial change in the competitive circumstances of the dealership. Plaintiff prevailed in the trial court on his claim that Hometown Oil had violated the provisions of Wis. Stat. 135.04 by failing to give the plaintiff 90 days' notice before beginning major repair work that disrupted operations at the dealer's service station for seven months, but lost in the state court of appeals. The appellate court analyzed the two statutes, finding ambiguity in the difference between the two statutes. It concluded that the words "of a dealership agreement" should be read into § 135.04 to "harmonize the statutes, effect their purpose, and avoid absurd results." *Jungbluth v. Hometown, Inc.*, 192 Wis.2d 450, 457–58, 531 N.W.2d 412, 414 (Ct.App.1995). (The court of appeals was not the only court to read the two statutes in the same way. *E.g., Computronics, Inc. v. Apple Computer, Inc.*, 600 F.Supp. 809, 813 (W.D.Wis.1985) (holding that grantor did not violate § 135.04 "if [grantor's] conduct conforms to what it expressly reserved the right to do in the agreement, then the conduct cannot be said to 'change the competitive circumstances of the dealership agreement' ").)

The supreme court disagreed with the court of appeals' reading of the two statutes, holding unanimously that inserting the phrase "of a dealership agreement" into § 135.04 would "profoundly undermine the expressed intent of the legislature." "Judicial protection of the terms of the agreement, rather than the individual dealer, or his business, systematically elevates the rights of the grantor over those of the dealer. We find that this outcome runs contrary to the explicit purpose of the WFDL '[t]o protect dealers against unfair treatment by grantors, who inherently have superior economic power and superior bargaining power in the negotiation of dealerships.' " *Jungbluth*, 201 Wis.2d at 330, 548 N.W.2d at 523.

In holding that Jungbluth could recover damages for his supplier's failure to give him notice of the proposed renovations to the service station, the supreme court established the principle that § 135.04 requires notice and an opportunity to cure even in situations in which a substantial change in competitive circumstances is permitted under the parties' agreement. It was irrelevant to the court that the agreement reserved to the supplier the explicit right to install underground fuel storage tanks (and the implicit right to remodel the service station). Under the holding in *Jungbluth*, I conclude that it is irrelevant in this case whether defendant reserved to itself the right to sell directly to plaintiff's customers. Even if it did, a jury could still find that defendant's decision to take over for itself the largest sale that plaintiff had ever negotiated constitutes a substantial change in the competitive circumstances, requiring defendant to give plaintiff 90 days' prior written notice and a 60–day opportunity for cure. (Given the differences between § 135.03 and § 135.04, however, defendant is not required to have good cause for making the change.)

Therefore, I conclude that plaintiff has shown that it has a likelihood of prevailing

upon the merits of its claim. I turn next to the question of irreparable harm.

### B. *Irreparable Harm*

To show irreparable harm, plaintiff must show that any injuries or losses that it will suffer from the denial of an order enjoining defendant from taking over the actuator sale to TomoTherapy cannot be compensated in money damages. Plaintiff has alleged that it will suffer losses over and above the loss of the commission it would earn if it handled the sale itself. These include the loss of the goodwill that it has developed in its eight-year relationship with TomoTherapy and future lost profits from sales of defendant's products and other product lines if it loses TomoTherapy as a customer. Plaintiff contends with some justification that calculation of the future losses would be unusually difficult because of the rapid growth that TomoTherapy has experienced and is expected to continue to experience in the near future. Plaintiff has earned good will for itself and for the products it sells after ten years of selling and servicing defendant's products. News of the loss of its biggest customer could affect its relationship with other customers adversely.

Plaintiff's showing of irreparable harm is scanty but sufficient to show that it would be harmed irreparably if an injunction does not issue.

### C. *Balance of Harms*

In contrast to the harm that plaintiff will suffer if an injunction does not issue, defendant is not likely to incur any harm if the injunction is granted, permitting plaintiff to proceed with the TomoTherapy order in the same manner as it has proceeded in the past. Defendant will secure the same profits it is accustomed to receiving. It has not shown that it is likely to suffer any other economic losses or that if it does, those losses cannot be readily calculated and compensated, should it prevail ultimately.

### D. *The Public Interest*

The nature of the injunction that plaintiff is seeking poses very little if any risk to the public. Whether plaintiff or defendant supplies the actuators to TomoTherapy directly, TomoTherapy will have the actuators for production purposes. Granting the injunction carries out the purposes of the fair dealership law enacted by the state legislature and to that extent, fulfills the public's interest.

### E. *Summary*

With the conclusion that plaintiff is entitled to a preliminary injunction on its fair dealership claim, it is not necessary to reach plaintiff's other claims of breach of the duty of good faith and fair dealing and tortious interference with a contract. Whether plaintiff will be able to prevail at trial or on summary judgment at any of its claims is another question entirely. At this point, it would behoove both parties to step back and take a long look at their situation. They have a ten-year track record of working together to their mutual benefit. Plaintiff has established a close and apparently satisfactory working relationship with TomoTherapy, a customer that neither party wishes to antagonize. Much of the parties' current difficulties appear to be the results of misunderstandings and their refusal to listen to each other. From a purely economic standpoint, they would be well served in putting their resources into an effort to resolve their business disputes rather than into litigation that might be destructive to their shared interests.

### ORDER

IT IS ORDERED that plaintiff Techmaster, Inc.'s motion for a preliminary injunction is GRANTED. Defendant Compact Automation Products, Inc. is ENJOINED PRELIMINARILY from taking any steps to make direct sales of its actua-

tors to TomoTherapy and from refusing to fill plaintiff's orders for actuators to be sold to TomoTherapy. No later than December 7, 2006, defendant shall advise the court in writing of the citizenship of its sole member, as well as the state or states in which defendant and its member have their principal places of business.