# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 05-1074

HOME PROTECTIVE SERVICES, INC.,

*Plaintiff-Appellant,*

v.

ADT SECURITY SERVICES, INC.,

*Defendant-Appellee.*

———————

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 03-C-444—**Lynn Adelman**, *Judge.*

———————

ARGUED OCTOBER 27, 2005—DECIDED FEBRUARY 13, 2006

———————

Before EASTERBROOK, EVANS, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Home Protective Services, Inc. ("HPS") sued ADT Security Services, Inc. ("ADT") for damages under the Wisconsin Fair Dealership Law ("WFDL"). The district court granted summary judgment in favor of ADT on the theory that there was no community of interest between the parties. Because we agree with the district court that the parties did not share a community of interest within the meaning of the WFDL, we reject HPS' argument that summary judgment was improperly granted and affirm the ruling.

## I. BACKGROUND

The facts in this case are not in dispute. Plaintiff-appellant HPS is a small, family-owned business that sells, installs, and repairs residential and small business security systems. In this industry, local dealers like HPS typically solicit customers, sign them to service contracts, and tender the contracts to large alarm companies like defendant-appellee ADT for a fee. The alarm companies choose which contracts to accept and which to reject. If the contract is accepted, then the dealer installs the alarm system, and the customer pays a monthly fee to the alarm company, which monitors the system and contacts local authorities if there is a break-in or fire. Defendant ADT is the leading alarm monitoring company in the United States. ADT markets its products through both an internal sales force and through its relationships with small dealers like HPS (the "ADT Authorized Dealer Program").

HPS was an ADT dealer from 1996 until its contract was suddenly terminated by ADT in August 2002. At the time of termination, the parties' relationship was governed by a document referred to as the 1998 ADT Authorized Dealer Agreement (the "Agreement"). The Agreement contained exclusivity and non-competition provisions which prevented HPS from working with any ADT competitors unless ADT first rejected the customer's contract. Once ADT accepted a contract, the account became ADT property, and HPS was not permitted to contact the customer for twenty-five years without written permission from ADT. HPS received a one-time net payment of $800 for each customer contract it tendered. HPS would then install the electronic security system, which had to bear the ADT logo and meet ADT specifications. If a customer renewed a contract upon expiration, HPS shared in the renewal income, which was $200-$1100 per month. If a customer canceled or defaulted, HPS paid ADT an attrition chargeback. HPS was required to advertise itself exclusively as an ADT authorized dealer.

During the relationship, HPS devoted 95% of its time and derived 95% of its revenues from its ADT business. It spent about 10% of its annual revenues, or about $32,000 per year, on ADT-specific direct mail advertising.

In August 2002, following a corporate restructuring, ADT ended its relationships with about 200 of its 700 Authorized Dealers. No notice or opportunity to cure was provided. According to HPS's expert, HPS incurred over $63,000 in one-time losses while it searched for a new partner and over $14,000 in recurring monthly losses once it began a less profitable relationship with one of ADT's competititors. As a result, HPS was forced to lay off most of its workforce and become a "mom-and-pop" operation. At the time of termination, HPS possessed about $10,000 worth of ADT promotional materials it could no longer use. HPS sued ADT, alleging that ADT had violated the WFDL by terminating the Agreement without providing notice or an opportunity for HPS to improve its performance. The district court granted summary judgment in favor of ADT, and HPS appeals.

## II.  ANALYSIS

*The District Court Properly Granted Summary Judgment in Favor of ADT Because HPS Failed to Show That There Was a Community of Interest between the Parties.*

We generally review a district court's grant of summary judgment *de novo. McCoy v. Gilbert*, 270 F.3d 503, 508 (7th Cir. 2001). However, although the parties here characterize this action as an appeal from a grant of summary judgment, there is no dispute as to either the facts or the law; the sole question is whether the agreed facts come within the ambit of the agreed law. This invites the question whether this case is more akin to bench trial on stipulated facts (in which case we would review the application of fact to law for clear error) or to a ruling on summary judgment (in which case

we would review the same questions *de novo*). *Hess v. Hartford Life & Accident Ins. Co.*, 274 F.3d 456, 461 (7th Cir. 2001) (judgment on stipulated facts more akin to a bench trial than to summary judgment, and therefore the district court's application of law to the facts should be reviewed for clear error). As the parties have not briefed the issue, and as our conclusion in this case would be the same under either standard, we think it best to reserve the question for another day. *See Cook, Inc. v. Boston Scientific Corp.*, 333 F.3d 737, 742 (7th Cir. 2003) ("No matter. The district judge's ruling [on stipulated facts] was not erroneous at all, and so the precise standard of review is unimportant").

The WFDL provides certain protections (the right to three months' notice and an opportunity to cure) to grantees "of a dealership situated in this state." WIS. STAT. §§ 135.04, 135.02(2). A dealership as defined by the statute contains three elements:

> [1]A contract or agreement . . . [2] between 2 or more persons, by which a person is granted the right to sell or distribute goods or services, or use a trade name . . . or other commercial symbol, [3] in which there is a community of interest in the business of offering, selling or distributing goods or services.

WIS. STAT. § 135.02(3)(a). The first two elements are clearly met here; the case turns on the third.

There is no bright-line test for determining whether community of interest exists. The two primary guideposts Wisconsin courts have established are (1) continuing financial interest and (2) interdependence, which must be great enough to threaten the financial health of the dealer if the grantor exercises its power to terminate. *Cent. Corp. v. Research Prods. Corp.*, 681 N.W.2d 178, 186 (Wis. 2004). The Wisconsin Supreme Court has identified a long list of

factors courts should consider in evaluating interdependence:

>[1] How long the parties have dealt with each other;

>[2] the extent and nature of the obligations imposed on the parties in the contract or agreement between them;

>[3] what percentage of time or revenue the alleged dealer devotes to the alleged grantor's products or services;

>[4] what percentage of the gross proceeds or profits of the alleged dealer derives from the alleged grantor's products or services;

>[5] the extent and nature of the alleged grantor's grant of territory to the alleged dealer;

>[6] the extent and nature of the alleged dealer's uses of the alleged grantor's proprietary marks (such as trademarks or logos);

>[7] the extent and nature of the alleged dealer's financial investment in inventory, facilities, and good will of the alleged dealership;

>[8] the personnel which the alleged dealer devotes to the alleged dealership;

>[9] how much the alleged dealer spends on advertising or promotional expenditures for the alleged grantor's products or services; and

>[10] the extent and nature of any supplementary services provided by the alleged dealer to consumers of the alleged grantor's products or services.

*Ziegler v. Rexnord,* 407 N.W.2d 873, 879-80 (Wis. 1987) (formatting altered). These factors may be distilled into two highly important questions in establishing a community of interest: (1) the percentage of revenues and profits the

alleged dealer derives from the grantor and (2) the amount of time and money an alleged dealer has sunk into the relationship. *Baldewein Co. v. Tri-Clover, Inc.*, 606 N.W.2d 145, 151 (Wis. 2000). Neither of these is sufficient alone, but strong facts in one area can make up for weaker facts in another area. *Id.* at 152 n.9. The ultimate question is whether the grantor has the alleged dealer "over a barrel" —that is, whether it has such great economic power over the dealer that the dealer will be unable to negotiate with the grantor or comparison-shop with other grantors. *Praefke Auto Elec. & Battery Co. v. Tecumseh Prods. Co.,* 255 F.3d 460, 464-65 (7th Cir. 2001).

Here, it is undisputed that HPS derived 95% of its revenue and devoted 95% of its personnel hours to its arrangement with ADT. However, the district court correctly found that because it could (and did) find another grantor to work with, it was not "over a barrel." The new relationship is not as economically advantageous to HPS, which was forced to cut back most of its staff, but the WFDL provides no protection from that kind of sustainable economic harm. As for HPS's lost investments in the relationship, the funds HPS invested in marketing the ADT name over the years may well have been recouped via increased sales during that time (*cf. Super Natural Distributors, Inc. v. Muscletech Research & Development*, 196 F. Supp. 2d 761, 773 (E.D. Wis. 2002)), and the $10,000 in unusable ADT promotional materials it currently has on hand is not sufficient to render it "over a barrel." HPS is not left with unsaleable inventory or unusable buildings as, for example, a fast food franchisor might be. This court has upheld grants of summary judgment to alleged grantors on very similar facts. *Kornacki v. Norton Performance Plastics,* 956 F.2d 129, 132-33 (7th Cir. 1992) (sales agent who did not have power to bind the grantor and who had not made a substantial capital investment specific to the grantor was not a dealer under WFDL, even though 75-85% of his

revenue came from selling the grantor's products); *compare Moodie v. School Book Fairs, Inc.*, 889 F.2d 739, 740-41 (7th Cir. 1989) (WFDL applied where alleged dealer had made a front-end investment of $46,000 in equipment to operate a book dealership on behalf of the grantor).

### III.  CONCLUSION

For the foregoing reasons, we AFFIRM the ruling of the district court.

A true Copy:

    Teste:

 

_____

*Clerk of the United States Court of Appeals for the Seventh Circuit*