The WATER QUALITY STORE, LLC,
Plaintiff-Respondent,

v.

DYNASTY SPAS, INC., Defendant-Appellant.†

Court of Appeals

*No. 2009AP1731. Submitted on briefs March 8, 2010.
—Decided July 15, 2010.*

2010 WI App 112

(Also reported in 789 N.W.2d 595.)

† Petition for Review dismissed 9-22-10.

719

720

722

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Kim Grimmer* of *Solheim Billing & Grimmer, S.C.*, Madison.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Gregory J. Strasser* and *Justin J. Bates* of *Strasser & Yde, S.C.*, Wausau.

Before Dykman, P.J., Vergeront and Higginbotham, JJ.

¶ 1. VERGERONT, J. In this action Water Quality Store, LLC, claims that Dynasty Spas, Inc., violated the Wisconsin Fair Dealership Law, Wis. Stat. ch. 135 (2007–08),[1] when Dynasty terminated the agreement under which Water Quality sold and serviced spas manufactured by Dynasty. Dynasty appeals the judgment entered on the jury verdict finding there was a dealership covered by the statute and awarding Water Quality $264,800 in damages for termination of the dealership. Dynasty contends: (1) the circuit court erred in denying Dynasty's motion to dismiss at the close of evidence because, Dynasty asserts, Water Quality failed to establish a community of interest between Dynasty and Water Quality as required by the Wisconsin Fair Dealership Law (WFDL); (2) the jury instruction on community of interest did not fairly instruct the jury; (3) there is no credible evidence to support the jury's award of damages; and (4) Dynasty should be granted a new trial because the damage award was excessive and contrary to the greater weight and clear preponderance of the evidence.

¶ 2. We affirm the jury's verdict. First, we conclude the court properly denied Dynasty's motion for dismissal at the close of evidence on the issue of a community of interest under the WFDL. We reject Dynasty's argument that *Home Protective Services, Inc. v. ADT Security Services, Inc.*, 438 F.3d 716, 720 (7th Cir. 2006), provides the applicable standard for determining a community of interest under the WFDL because, we conclude, it is inconsistent with *Ziegler Co. v. Rexnord, Inc.*, 139 Wis. 2d 593, 407 N.W.2d 873

---

[1] All references to the Wisconsin Statutes are to the 2007–08 version unless otherwise noted.

(1987), as recently applied in *Central Corp. v. Research Products Corp.*, 2004 WI 76, 272 Wis. 2d 561, 681 N.W.2d 178.

¶ 3. Second, we conclude the circuit court properly exercised its discretion in declining to give Dynasty's proposed jury instructions on the community of interest. For the reasons we explain below, we do not decide whether the instruction actually given was an erroneous exercise of discretion.

¶ 4. Finally, we reject Dynasty's challenges to the damages award and decline to order a new trial in the interests of justice.

## BACKGROUND

¶ 5. Water Quality is a business located in Wisconsin Rapids that sells and services spas and also sells water conditioning equipment. Sixty to seventy percent of its business is selling spas as opposed to water conditioning equipment. Dynasty is a Tennessee corporation engaged in the business of manufacturing and distributing spas to retailers. In 2000 Dynasty entered into a "letter of intent/dealer agreement" under which Water Quality was to sell and service spas manufactured by Dynasty. Water Quality sold and serviced Dynasty spas until July 2007, when Dynasty terminated the agreement. With a few exceptions early in the relationship, Water Quality promoted and sold only Dynasty spas.

¶ 6. The termination letter stated that, although Water Quality had "represented our company in a most professional manner and we have the utmost respect for you both as an individual and as a professional dealer . . . we have decided to . . . accommodate [a] new high volume dealer and give him an exclusive selling

territory." More specifically, Dynasty explained at trial that a business that sold Dynasty spas in its Chippewa Falls, Rhinelander, and Schofield stores, and had initially agreed not to sell them at its Stevens Point store, told Dynasty in 2007 that, if it could not sell Dynasty spas in Stevens Point, it would no longer sell them in the other three stores.

¶ 7. Water Quality filed this action alleging a violation of the WFDL and seeking damages. After the circuit court denied Dynasty's motion for summary judgment, the case was tried to a jury. The jury was asked to answer two questions: (1) Did a dealership covered by the WFDL exist between Water Quality and Dynasty? (2) If so, what sum of money will fairly and reasonably compensate Water Quality for the termination of the dealership agreement by Dynasty? The jury answered the first question "yes" and awarded $264,800 in compensatory damages.

¶ 8. Dynasty filed a number of motions for post-verdict relief, which the circuit court denied. The court entered an order and judgment awarding Water Quality $264,800 in compensatory damages plus interest, taxable statutory costs, and attorney fees and costs under Wis. Stat. § 135.06.

## DISCUSSION

¶ 9. On appeal Dynasty contends: (1) the circuit court erred in denying Dynasty's motion to dismiss at the close of evidence because, according to Dynasty, Water Quality failed to establish a community of interest; (2) the jury instruction on the community of interest did not fairly instruct the jury; (3) there is no credible evidence to support the jury's award of damages; and (4) Dynasty should be granted a new trial

because the damage award was excessive and contrary to the greater weight and clear preponderance of the evidence. We first set forth some background on the WFDL and then address the four issues.

I. Wisconsin Fair Dealership Law

¶ 10. The purpose of the WFDL is to promote the public's interest in fair relationships between dealers and grantors and to protect dealers from unfair treatment by grantors, who may use their superior economic and bargaining powers to the disadvantage of small business owners. WIS. STAT. § 135.025(2)(a) and (b); *Central Corp.*, 272 Wis. 2d 561, ¶ 28. A dealership, as defined in § 135.02(3)(a), is comprised of the following elements: "(1) a contract or agreement; (2) which grants the right to sell or distribute goods or services, or which grants the right to use a trade name, logo, advertising or other commercial symbol; and (3) a community of interest in the business of offering, selling or distributing goods or services." *Central Corp.*, 272 Wis. 2d 561, ¶ 29 (citations omitted).[2]

¶ 11. The WFDL imposes several requirements upon grantors attempting to terminate or substantially change the terms of a dealership. Under WIS. STAT. § 135.04, a grantor must give written notice of a termination or change in the dealership at least ninety days prior to the action, state the reasons for its decision, and provide the dealer sixty days in which to remedy any claimed deficiency. Because there is no dispute in

---

[2] A "dealer" is a person who is a grantee of a dealership situated in this state. WIS. STAT. § 135.02(2).

this case that Dynasty did not do this, if there is a dealership under the WFDL, then Dynasty violated the statute.

¶ 12. In *Ziegler* the supreme court established two guideposts, which, "if satisfied, would lead to the conclusion that the parties shared a community of interest": a continuing financial interest and interdependence. *Central Corp.*, 272 Wis. 2d 561, ¶ 31–32 (citing *Ziegler*, 139 Wis. 2d at 604–605). Interdependence is "the degree to which the dealer and grantor cooperate, coordinate their activities and share common goals in their business relationship." *Ziegler*, 139 Wis. 2d at 605. "When construed together, these guideposts must reveal an interest in a business relationship great enough to threaten the financial health of the dealer, if the grantor were to decide to exercise its power to terminate." *Central Corp.*, 272 Wis. 2d 561, ¶ 32 (citing *Ziegler*, 139 Wis. 2d at 605).

¶ 13. The *Ziegler* court also identified the facets of the business relationship courts are to consider in determining whether there is a continuing financial interest and interdependence. These ten facets include:

> [1] how long the parties have dealt with each other; [2] the extent and nature of the obligations imposed on the parties in the contract or agreement between them; [3] what percentage of time or revenue the alleged dealer devotes to the alleged grantor's products or services; [4] what percentage of the gross proceeds or profits of the alleged dealer derives from the alleged grantor's products or services; [5] the extent and nature of the alleged grantor's grant of territory to the alleged dealer; [6] the extent and nature of the alleged dealer's uses of the alleged grantor's proprietary marks (such as

trademarks or logos); [7] the extent and nature of the alleged dealer's financial investment in inventory, facilities, and good will of the alleged dealership; [8] the personnel which the alleged dealer devotes to the alleged dealership; [9] how much the alleged dealer spends on advertising or promotional expenditures for the alleged grantor's products or services; [and] [10] the extent and nature of any supplementary services provided by the alleged dealer to consumers of the alleged grantor's products or services.

*Ziegler*, 139 Wis. 2d at 606. This list is not exhaustive and each of these facets may relate to one or both of the guideposts. *Id.* In considering these facets, the court is not limited to the agreement between the parties but is also to take into account the manner in which the parties actually operated under the agreement. *Id.* at 609 n.11.

II. Dismissal at the Close of Evidence

A. Correct legal standard

¶ 14. Dynasty contends the circuit court erred in denying its motion to dismiss at the close of the evidence. According to Dynasty, the undisputed evidence showed there was no community of interest. Dynasty's primary argument is that, as a matter of law, Water Quality was not dependent on Dynasty for its economic livelihood because Water Quality was able to find other sources of spas to sell. Alternatively, Dynasty contends there are no disputed facts regarding the application of the *Ziegler* facets.

¶ 15. Turning to Dynasty's primary argument, we agree it is undisputed that in 2008, the year after termination, Water Quality sold the spas of two other manufacturers. We note, however, that Water Quality

sold only 28 total spas that year compared to the 36 Dynasty spas it sold in 2006. Dynasty apparently views this difference to be irrelevant. It relies on the federal case, *Home Protective Services*, 438 F.3d 716, for its theory that Water Quality's ability to find other spas to sell so quickly is dispositive.

¶ 16. In *Home Protective Services* the United States Court of Appeals for the Seventh Circuit affirmed the district court's conclusion that there was no dealership between an alarm monitoring company and the small business that solicited customers for service contracts, tendered the contracts to the monitoring company, and installed the alarm system if the company accepted the contract. *Home Protective Servs.*, 438 F.3d at 717-18. The Seventh Circuit first set forth the two guideposts and the ten facets established in *Ziegler* and then stated:

> The ultimate question is whether the grantor has the alleged dealer "over a barrel"—that is, whether it has such great economic power over the dealer that the dealer will be unable to negotiate with the grantor or comparison-shop with other grantors. [Citation omitted.]
>
> Here, it is undisputed that [the alleged dealer] derived 95% of its revenue and devoted 95% of its personnel hours to its arrangement with [the alleged grantor]. However, the district court correctly found that because it could (and did) find another grantor to work with, it was not "over a barrel." The new relationship is not as economically advantageous to [the alleged dealer], which was forced to cut back most of its staff, but the WFDL provides no protection from that kind of sustainable economic harm. As for [the alleged dealer's] lost investments in the relationship, the funds [it] invested in marketing the [alleged grantor's] name over the years may well have been recouped via increased

sales during that time ... and the $10,000 in unusable ... promotional materials it currently has on hand is not sufficient to render it "over a barrel." [The alleged dealer] is not left with unsaleable inventory or unusable buildings as, for example, a fast food franchisor might be.

*Home Protective Servs.*, 438 F.3d at 720.

■■

¶ 17. Federal cases applying Wisconsin law do not have precedential authority for Wisconsin courts, although we may consider them for their persuasive value. *Kaloti Enter., Inc. v. Kellogg Sales Co.*, 2005 WI 111, ¶ 23, 283 Wis. 2d 555, 699 N.W.2d 205. If a federal case applying Wisconsin law conflicts with a decision of the Wisconsin Supreme Court or with a published decision of this court, we must follow the Wisconsin case. *Professional Office Bldgs., Inc. v. Royal Indem. Co.*, 145 Wis. 2d 573, 580, 427 N.W.2d 427 (Ct. App. 1988).

¶ 18. We decline to adopt the analysis employed by the Seventh Circuit in *Home Protective Services* because we cannot reconcile it with the Wisconsin Supreme Court's most recent application of the community of interest standard in *Central Corp.*, 272 Wis. 2d 561.

¶ 19. In *Central Corp.* it was undisputed that there had been a twenty-year relationship between a wholesaler and manufacturer with no written contract and that the manufacturer's products comprised approximately eight to nine percent of the wholesaler's sales and profits over the years. *Id.*, ¶¶ 7, 9. In reversing our summary judgment that there was no community of interest, the supreme court, applying the *Ziegler* facets, identified the following factors that warranted a trial: the parties' twenty-year business relationship; the

731

financial investment the wholesaler made in warehouse facilities, on which it appeared there was a genuine issue of material fact as to whether the wholesaler incurred increased lease costs because it had to build new warehouse space to house inventory; a factual dispute over whether the wholesaler had a specific sales territory; the fact that the only humidifier the wholesaler stocked was that of the manufacturer; the supply of spare parts the wholesaler kept on hand to serve the customers who experienced problems with the product, a service on which the wholesaler made no profit; and the fact that the wholesaler kept a substantial amount of inventory on hand. *Id.*, ¶ 35.

¶ 20. In remanding for a trial, the supreme court was implicitly ruling that, if the disputed facts on the nature of the territory and the reason for the expanded warehouse were resolved favorably to the alleged dealer, all the facts together and the reasonable inferences from them could support a determination of a community of interest. Thus, the supreme court was implicitly rejecting the manufacturer's argument that summary judgment in its favor was proper because its products provided too small a percentage of the wholesaler's revenues to imperil its well-being and because the wholesaler had not shown that it had invested in substantial specialized assets exclusively related to the manufacturer's products. *See id.*, ¶¶ 25, 27.

¶ 21. There is another way in which the Seventh Circuit's analysis cannot be reconciled with that in *Central Corp.* and, for that matter, earlier Wisconsin supreme court cases. The Seventh Circuit's focus on whether the alleged dealer is able to find another supplier of goods after termination—even on less ad-

vantageous terms—does not appear in the standard for a community of interest as formulated and applied by our supreme court. The *Ziegler* facets address aspects of the business relationship between the alleged dealer and grantor. Those are analyzed to determine the degree of continuing financial interest and interdependence between the alleged dealer and the grantor. *Ziegler*, 139 Wis. 2d at 606–07. The purpose of analyzing the relationship in this way is to determine whether the alleged dealer has a "stake in the relationship large enough to make the grantor's power to terminate . . . a threat to the economic health," meaning the termination "*would* have a significant economic impact on the alleged dealer." *Id.* at 605 (emphasis added).[3] This standard does not depend upon the existence or amount of damages that occur *after* termination but on the degree of continuing financial interest and interdependence that existed *before* the termination. Of course, the two may be related, but they are not the same and they are not necessarily related. An alleged dealer may be highly successful in mitigating damages by finding

[3] In articulating the relationship between the two guideposts and the threat of economic harm to the dealer as expressed in *Ziegler*, we recognize that the two guideposts are defined in terms of the interests and goals of both parties, whereas the threat to the economic health refers only to the dealer's economic health. *See Ziegler Co. v. Rexnord, Inc.*, 139 Wis. 2d 593, 604–05, 407 N.W.2d 873 (1987) (continuing financial interest "contemplates a *shared financial interest* in the operation of the dealership or the marketing of a good or service," and interdependence is "the degree to which *the dealer and grantor cooperate, coordinate their activities and share common goals*" (emphasis added)). This raises the question of why and how the interests and goals of the grantor fit in the overall analysis. We believe litigants and courts would benefit from a clarification on this point by the supreme court.

replacement products—because of effort or good fortune or both—but it does not follow that before termination the alleged grantor did not have superior bargaining power because of the nature of the relationship.[4]

¶ 22. Having concluded that we should not adopt the analysis of community interest in *Home Protective Services,* we analyze Dynasty's motion to dismiss at the close of evidence applying the standard established in *Ziegler* and most recently applied by the supreme court in *Central Corp.* We turn to Dynasty's argument that, with respect to the *Ziegler* facets, the undisputed facts entitle it to judgment as a matter of law that there was no community of interest.

## B. Analysis of Evidence

¶ 23. A motion challenging the sufficiency of the evidence at the close of all evidence may not be granted "unless the court is satisfied that, considering all credible evidence in the light most favorable to the party against whom the motion is made, there is no credible evidence to sustain a finding in favor of such a party."

---

[4] Dynasty refers to our decision in *Moe v. Benelli U.S.A. Corp.,* 2007 WI App 254, ¶ 15, 306 Wis. 2d 812, 743 N.W.2d 691, in which we cited to *Home Protective Services, Inc. v. ADT Security Services, Inc.,* 348 F. Supp. 2d 1010, 1014 (E.D. Wis. 2004), and Seventh Circuit cases using the "over a barrel" phrase from those cases, indicating that this phrase was the equivalent of "threat to the economic health of the [alleged] dealer." We did not further discuss these cases and we did not endorse or apply any standard other than that set forth in *Ziegler* and *Central Corp. v. Research Products Corp.,* 2004 WI 76, 272 Wis. 2d 561, 681 N.W.2d 178.

*Weiss v. United Fire & Cas. Co.*, 197 Wis. 2d 365, 388, 541 N.W.2d 753 (1995); Wis. Stat. § 805.14(1). This is the standard applied by both the circuit court and this court in reviewing the circuit court's determination of the motion. *Weiss,* 197 Wis. 2d at 388. However, in our review, we "must also give substantial deference to the trial court's better ability to assess the evidence" because that court is better positioned to decide the weight and relevancy of the testimony. *Id.* at 388–89.

¶ 24. Applying this standard, we disagree with Dynasty that all the evidence relevant to the application of the *Ziegler* facets is undisputed. Although much of it is, there are some material factual disputes, including competing reasonable inferences from undisputed evidence. One example will suffice. One of the *Ziegler* factors is "the extent and nature of the alleged grantor's grant of territory to the alleged dealer." *Ziegler,* 139 Wis. 2d at 606. Whether the alleged dealer has an exclusive territory is a factor in assessing whether the alleged grantor has a financial interest in the relationship. *See H. Phillips Co. v. Brown-Forman Distillers Corp.,* 483 F. Supp. 1289, 1292 (W.D. Wis. 1980) ("The most persuasive objective factor [in deciding whether the alleged grantor has a continuing financial interest in the relationship] would be whether a particular 'dealer' is the only sales outlet for the manufacturer within a defined territory . . ."). *See also Guderjohn v. Loewen-Am., Inc.,* 179 Wis. 2d 201, 212, 507 N.W.2d 115 (Ct. App. 1993) (treating the lack of an exclusive territory as weighing in favor of a conclusion of no community of interest).

¶ 25. Viewing the evidence most favorably to Water Quality, a reasonable fact-finder could conclude that

both Water Quality and Dynasty operated on the premise that Water Quality had an exclusive territory in central Wisconsin. Although the "letter of intent/dealer agreement" did not define a territory for Water Quality and did not state that Water Quality had an exclusive territory, James Dewitt, owner of Water Quality, believed that Water Quality was the exclusive dealer in central Wisconsin, and Dynasty's president assured him of this in 2006. While Dynasty contends that the testimony on this conversation shows that Dewitt did not form this understanding until 2006, a reasonable view of the evidence that is favorable to Water Quality is that Dewitt had this view from the beginning of the relationship and this view was confirmed by Dynasty in the 2006 conversation. In addition, a Dynasty employee's trial testimony on the reason for terminating Water Quality is strong support for an exclusive territory. She testified that Dynasty had not permitted the business with a store in Stevens Point to sell Dynasty spas there because Water Quality sold them in that area; when Dynasty decided to accede to that business's demand to sell Dynasty spas at its Stevens Point store, it terminated Water Quality.[5]

---

[5] Dynasty emphasizes that the existence of a community of interest presents a question of law, while acknowledging some uncertainty on this point arising from *Central Corp.* In *Central Corp.*, the Wisconsin Supreme Court stated that "[w]here there are genuine issues of material fact or reasonable alternative inferences drawn from undisputed material facts, the determination of whether there is a community of interest is one which will be made by the trier of fact based on an examination of all of the facets of the business relationship." *Central Corp.*, 272 Wis. 2d 561, ¶ 2. We concluded in *Moe*, 306 Wis. 2d 812, ¶ 8 n.5, that *Central Corp.* does not overrule the supreme court's prior cases holding that, where the evidence and reasonable infer-

¶ 26. Dynasty does not present a developed argument that, even if the evidence reasonably supports a finding of an exclusive territory, the court nonetheless erred in not dismissing at the close of the evidence. We

ences from the evidence are undisputed, whether a community of interest exists between the grantor and the dealer is an issue of law for the court. *See, e.g., Bush v. Nat'l Sch. Studios, Inc.*, 139 Wis. 2d 635, 645–46, 407 N.W.2d 883 (1987); *Kania v. Airborne Freight Corp.*, 99 Wis. 2d 746, 762–63, 300 N.W.2d 63 (1981). However, these cases are not applicable here because we have rejected Dynasty's contention that the evidence is undisputed.

It is true, as Dynasty points out, that there is an uncertainty arising from *Central Corp.* on the role of the fact-finder when there are material disputes of facts or of reasonable inferences from facts. We did not address this in *Moe* because the facts there were undisputed. As Dynasty asserts, citing to Michael A. Bowen and Brian E. Butler, THE WISCONSIN FAIR DEALERSHIP LAW § 4.26A at Supp. 4–17 (3d ed. Supp. 2010), the above-cited sentence from *Central Corp.* and other similar passages could mean either that the fact-finder decides if there is a community of interest or that the fact-finder decides only what the facts are (if disputed) relevant to the *Ziegler* facets, and the court decides if there is a community of interest.

We need not resolve this issue in this case. Dynasty is not arguing on appeal that, if there is any material factual dispute, the jury should have resolved only the factual disputes relevant to the *Ziegler* facets and the court should have decided if there was a community of interest. Apparently it did not make this argument in the circuit court, either. Therefore, for purposes of this opinion, we are assuming without deciding that the jury was properly asked to determine if there was a dealership, including whether there was a community of interest.

Although we do not resolve the issue of the role of the fact-finder in this case, we believe that litigants and courts would benefit from a clarification by the supreme court of the role of the fact-finder when there are factual disputes involved in determining whether there is a community of interest.

737

could for this reason end our discussion on Dynasty's motion here. However, an analysis of the other evidence favoring a conclusion of a community of interest will be helpful to issues discussed later in this opinion. We therefore undertake that analysis here. For the following reasons we conclude that, viewing the evidence in a manner most favorable to Water Quality, it reasonably supports a determination that there is a community of interest.

¶ 27. A highly significant factor in this case supporting a determination of community of interest is that between sixty and seventy percent of Water Quality's business has been in spa sales. Dynasty conceded this in its opening argument and Dewitt confirmed this in his testimony. Another highly significant factor, also undisputed, is that, except for five spas from another manufacturer that were sold in early 2001 or 2002, Water Quality sold only Dynasty spas. Although the agreement did not prohibit the sale of other spas, according to Dewitt "it was looked on favorably if you did." Dewitt's testimony was that his gross sales for the entire business were approximately $400,000 per year during the relationship with Dynasty, with about $260,000 from spa sales.

¶ 28. While the supreme court in *Ziegler* rejected a standard for community of interest based exclusively on a fixed percentage of business time or business revenues, it also recognized that "these percentages are important indicators of whether there is a community of interest . . . ." *Ziegler*, 139 Wis. 2d at 603. The significance of a substantial percentage was subsequently confirmed in the description of a community of interest in *Baldewein Co. v. Tri-Clover, Inc.*, 2000 WI 20, ¶ 27, 233 Wis. 2d 57, 606 N.W.2d 145.

738

¶ 29. There is no doubt that Water Quality derived substantial revenues from its sale of Dynasty spas as a percentage of its total business. The large percentage reasonably indicates that both Dynasty and Water Quality have a continuing financial interest in the relationship and that Water Quality is highly dependent on this relationship for its economic health.

¶ 30. As we have already explained in paragraphs 24–25, a reasonable fact-finder could find that Water Quality had an exclusive territory. This fact may reasonably be viewed as contributing to a continuing financial interest in the relationship.

¶ 31. The evidence regarding Water Quality's repairs of the Dynasty spas it sold reasonably contributes both to a continuing financial interest and to interdependence. The written agreement required Water Quality to perform the warranty repair work on the spas it sold, to be reimbursed by Dynasty. Water Quality did this and sent two or three of its employees each year to training at Dynasty headquarters in Tennessee. Dynasty paid for the motel room and one meal a day, and Water Quality paid their wages, transportation and other meals. In order to service Dynasty spas, Water Quality kept an inventory of parts of approximately $10,000. Dewitt testified that Water Quality enhanced Dynasty's reputation to customers by providing warranty repair work in "gray areas" where the Dynasty warranty did not cover the work. Water Quality would cover the repair cost and give Dynasty the credit for this.

¶ 32. The evidence on Water Quality's advertising and marketing Dynasty spas reasonably indicates that Water Quality invested significant time and expense, relative to its spa revenues, to market itself as a dealer in Dynasty spas in 2000. Water Quality displayed Dy-

nasty spas at home shows, fairs, and expos, and distributed literature and handouts. Beginning in 2001, Water Quality sent out tens of thousands of mailers showing Dynasty spas with Water Quality named as the Dynasty dealer; and in 2004, when another Dynasty model came out, Water Quality sent out tens of thousands of copies of another mailer advertising that. Water Quality also advertised itself as a Dynasty dealer in advertisements in church bulletins, school yearbooks and similar publications. Water Quality never advertised for any spas besides Dynasty while it was selling Dynasty spas, and promoted only Dynasty spas on its website. During its relationship with Dynasty, Water Quality spent approximately $30,000 in advertising that promoted Dynasty. Dynasty provided Water Quality with an outdoor sign with its name and logo.

¶ 33. Dewitt testified that the time and effort Water Quality put into building up the reputation of Dynasty as producing a top quality spa and always honoring its warranty, even in "gray areas," benefited and still benefits Dynasty. According to Dewitt, these efforts are now benefiting Water Quality's competitor —the business that is now selling Dynasty spas from its Stevens Point store.

¶ 34. Also reasonably indicative of interdependence is Dewitt's participation on Dynasty's behalf at the national pool and spa shows. At these events Dewitt was introduced as a dealer, and he was there to talk to prospective dealers to promote Dynasty and its products and show how the products worked. He was not there to sell spas for Water Quality. Additional evidence of interdependence are awards Water Quality received from Dynasty: a "partnership award" in 2001 for "outstanding growth and unsurpassed commitment," and in

2005 and 2006 "preferred dealer" awards, which Water Quality displayed in its showroom.

¶ 35. It is true, as Dynasty contends, that Dynasty did not require an investment by Water Quality, other than the purchase of spas. Dynasty also did not require Water Quality to purchase a specific number of spas, to spend any specific amount on advertising, to do specific kinds of advertising, or to lay out its showroom in a specific manner. However, this evidence, in the context of all the evidence recited in the preceding paragraphs, does not require a ruling as a matter of law that there is no community of interest.

¶ 36. Accordingly, we conclude the circuit court properly denied Dynasty's motion for dismissal at the close of the evidence.

III. Jury Instruction on Community of Interest

¶ 37. The jury was instructed that, in order to determine that a dealership existed, it must find that: (1) there was a contract under which Water Quality was given the right by Dynasty to sell its spas and use Dynasty's trade name in selling its products; and (2) there was a community of interest between the two parties. The instruction explained that a community of interest means that "the parties shared a continuing financial interest in which the parties cooperated and coordinated their activities in operating the dealership business or marketing the dealership's goods or services and share common goals in their business relationship." The jury was instructed that, in determining if a community of interest existed, it was to consider "among the things" the listed factors, ten of which were the *Ziegler* facets. The eleventh was: "Whether a termination of the relationship posed a substantial threat to

the economic health of the dealer." Except for the eleventh factor, the instruction was consistent with WIS JI—CIVIL 2769.[6]

¶ 38. The addition of the eleventh factor was prompted by Dynasty's proposed additions to WIS JI—CIVIL 2769, which it labeled "Instruction B" and "Instruction C." Proposed Instruction B stated that "[t]here is an additional component . . . to consider" and that the jury should find a community of interest only if it concluded, based on all the evidence, that Water Quality's "stake in the business relationship with Dynasty Spas was large enough that Dynasty's power to terminate . . . posed a significant threat to the economic health of [Water Quality]."[7] Proposed Instruction C stated in part, "[p]ut in a slightly different fashion, the

---

[6] According to Bowen and Butler, it appears to be an open question whether there is a right to a jury trial in a WFDL case. Bowen and Butler, THE WISCONSIN FAIR DEALERSHIP LAW § 4.26A at Supp. 4–2. That issue is not presented in this case.

[7] Proposed Instruction B provides in full:

> There is an additional component for you to consider in determining whether a community of interest exists between Dynasty Spas and The Water Quality Store. The Wisconsin Fair Dealership Law is not intended to cover every vendor-vendee relationship. You should only find that a community of interest existed between the parties if you conclude, based on all the evidence in this case, that The Water Quality Store's stake in the business relationship with Dynasty Spas was large enough that Dynasty's power to terminate, cancel or not renew the relationship posed a significant threat to the economic health of The Water Quality Store. The alleged dealer's economic health is threatened where the dealership's business status is dependent on the relationship for its economic livelihood. If such dependency does exist, the business would be extremely vulnerable if terminated without good cause and adequate notice. *Ziegler Co., Inc. v. Rexnord, Inc.*, 139 Wis. 2d 593, 605, 407 N.W.2d 873, 879 (Sup. Ct. June 25, 1987); *Bush v. National School Studios, Inc.*, 139 Wis. 2d 635, 651, 407 N.W.2d 883, 890 (Sup. Ct. June 25, 1987).

function of the community of interest requirement is to limit the application of the Wisconsin Fair Dealership Law to those situations where the grantor of the dealership has the alleged dealers 'over the barrel,' so that the dealer cannot negotiate with the grantor, or comparison shop with other grantors."[8]

¶ 39. The circuit court declined to give Instruction B and C and instead added "substantial threat to the economic health" as a factor to consider in addition to the ten *Ziegler* facets.

¶ 40. Dynasty contends that the court's instruction did not accurately state the law because the ten *Ziegler* facets are "intermediate considerations in arriving at an ultimate conclusion" on whether a termination will pose a substantial threat to the economic health of the dealer. The instruction probably misled the jury, Dynasty asserts, because it did not give any prominence to the "substantial threat to the economic health" issue.

¶ 41. A circuit court has wide discretion when instructing the jury and we affirm if "the overall meaning communicated by the instruction as a whole was a correct statement of the law, and the instruction com-

---

[8] Proposed Instruction C provides in full:

Put in a slightly different fashion, the function of the community of interest requirement is to limit the application of the Wisconsin Fair Dealership Law to those situations where the grantor of the dealership has the alleged dealer "over the barrel," so that the dealer cannot negotiate with the grantor, or comparison shop with other grantors. *Home Protective Services, Inc. v. ADT Security Services, Inc.*, 438 F.3d 716, 720 ([7th Cir.] 2006); *Praefke Auto Elec. & Battery Co. v. Tecumseh Prods. Co.*, 255 F.3d 460, 464 (7th Cir. 2001); *Moe v. Benelli U.S.A. Corp.*, 306 Wis. 2d 812, 743 N.W.2d 691 (Ct. App. 2007).

With respect to the reference to *Moe* in this instruction, see *supra,* ¶ 21 n.4.

ported with the facts of the case . . . ." *Nommensen v. American Cont'l Ins. Co.*, 2001 WI 112, ¶ 50, 246 Wis. 2d 132, 629 N.W.2d 301 (citation omitted). Even if the circuit court committed an error in the instruction, we do not reverse unless the error affects the substantial rights of the parties. *Id.*, ¶ 51. This means that there is a reasonable possibility that the error contributed to the outcome of the action, or, phrased differently, there is a reasonable possibility that the outcome would have been different without the error. *Id.*, ¶¶ 52–54.

¶ 42. We conclude the court did not err in declining to give the proposed Instructions B and C. With respect to Instruction B, the "additional component" of "pos[ing] a significant threat to the economic health of [Water Quality]" is unrelated to the two guideposts and the ten *Ziegler* facets described in the standard instruction and appears to make the guideposts and *Ziegler* facets irrelevant. This is not a correct statement of Wisconsin law. As *Ziegler* makes clear and *Central Corp.* confirms, the means by which we are to determine if the alleged dealer's stake in the relationship is great enough to pose a significant or substantial threat to the economic health of the alleged dealer is by analyzing the *Ziegler* facets to determine the degree of continuing financial interest and interdependence between the alleged dealer and grantor. *Ziegler*, 139 Wis. 2d at 605–607; *Central Corp.*, 272 Wis. 2d 561, ¶¶ 32–33.

¶ 43. With respect to proposed Instruction C, it is based on the terminology used by the Seventh Circuit in *Home Protective Services*, 438 F.3d at 720. To the extent this instruction is simply another way of phrasing proposed Instruction B, it does not add anything substantive and suffers from the same defect identified in

the preceding paragraph. To the extent this instruction is intended to express the substantive standard applied in *Home Protective Services*, we have already explained why that is inconsistent with Wisconsin Supreme Court decisions. *See supra,* ¶¶ 14–21.

¶ 44. Turning to the instruction the court did give, we see from the record of the instruction conference that, although the court declined to give Dynasty's proposed instructions, it agreed with Dynasty that the jury should consider whether there was a "substantial threat to the economic health of the alleged dealer." We are uncertain why the court decided to treat this consideration, in effect, as an eleventh *Ziegler* facet rather than in the manner expressly stated in *Ziegler* and repeated in *Central Corp.*: as further definition to the degree of continuing financial interest and interdependence required. However, for the following reasons we do not resolve whether the court erred in placing this consideration where it did rather than in the discussion of the two guideposts.

¶ 45. First, as we understand the record, neither party proposed this latter alternative to the court. Second, even if the court erred in placing the "threat to economic health" consideration with the ten *Ziegler* facets instead of in the discussion of the two guideposts, we conclude this error did not contribute to the jury's determination that there was a community of interest. We acknowledge that describing this consideration in the context of explaining the purpose of the two guideposts instead of as one of eleven factors to consider would give it more prominence. However, it is highly unlikely that the jury did not give prominent consideration to the impact of termination on Water Quality's economic health even though that consideration was

listed as one of eleven factors. We reach this conclusion because it is highly likely that the jury relied heavily on the undisputed facts regarding the large percentage of revenue that Dynasty spas generated for Water Quality. This is consistent with Wisconsin case law, *see* paragraph 28, and is strong evidence that termination by Dynasty would pose a substantial, or significant, threat to Water Quality's economic health. Logically, the possibility is slim to none that placement of the "threat to economic health" in the more prominent position of a discussion of the two guideposts would have resulted in a determination that there was *no* community of interest.

## IV. Damages

¶ 46. Dynasty contends there is no credible evidence to support the damage award of $264,800. It asserts that the testimony and report of Water Quality's expert, Kerry Karnitz, was incredible on a number of points; that Water Quality did not prove the fact of damages with reasonable certainty; and that it did not prove net profits as required by *Lindevig v. Dairy Equipment Co.*, 150 Wis. 2d 731, 442 N.W.2d 504 (Ct. App. 1989). For the reasons that follow, we disagree with each argument.

¶ 47. When we review a jury award of damages, we affirm if there is any credible evidence that under any reasonable view supports the jury finding as to the amount of damages, and this is especially true when the verdict is sustained by the circuit court. *D.L. Anderson's Lakeside Leisure Co. v. Anderson*, 2008 WI 126, ¶ 26, 314 Wis. 2d 560, 757 N.W.2d 803 (citation omitted). The reviewing court has a duty to search for credible evi-

dence to sustain the jury's verdict. *Id.*, ¶ 22. We evaluate the sufficiency of the evidence in light of the jury instructions given. *Id.*

¶ 48. In this case the circuit court rejected the challenges to the damages award that Dynasty asserts on appeal. Dynasty emphasizes the circuit court's frank disagreement with the amount of the verdict and its forcefully stated negative view of the credibility of Water Quality's expert. We do not view the circuit court's comments as support for Dynasty's position or as a reason to disregard the court's decision not to set aside the award. Read in context, it is clear that the circuit court understood the proper standard of review of a jury verdict and concluded that the award had to be affirmed under this standard. While expressing its personal view of the evidence and Water Quality's expert, it also made clear that the jury could appropriately take a different view and arrive at a different conclusion.

¶ 49. The jury in this case was instructed on damages generally and on future lost profits specifically as an appropriate basis for awarding damages for a violation of the WFDL. In accordance with established law, the jury was instructed that it was Water Quality's burden to prove damages, including lost future profits, by the greater weight of the credible evidence to a reasonable certainty. It was also instructed that a guess or speculation was not adequate to meet this burden of proof, but mathematical precision was not required. *See* Wis JI—Civil 1700 and 3725. With respect to lost future profits in particular, the jury was instructed that:

> In the very nature of things, such profits cannot be definitely determined. If the wrong itself is of such a nature as to preclude the determination of the amount of damages with certainty, it will be enough if the

747

> evidence shows the extent of the damages as a matter of just and reasonable estimation, although the result may only be approximate.

*See* Wis JI—Civil 3725. As for how to calculate lost future profits, the jury was instructed that "evidence of prior profits in the same business may be used . . . as a basis for a computation of loss of future profits as well as any other evidence in the case bearing upon the issue," and that they should be determined as of the date of termination, July 16, 2007.

¶ 50. Water Quality's damages claim as presented in Karnitz's report consisted of the following components: (1) the difference between the projected gross profits ("gross profits" meaning the amount received from the sale of the spas minus the price paid for the spas and freight) for the years 2008–2016 selling spas other than Dynasty and the projected gross profits had Water Quality continued selling only Dynasty spas in those years;[9] (2) the projected floor-plan interest costs[10] Water Quality will incur for the purchase of the replacement spas for those years, in part because it will no longer benefit from the ninety-day interest-free financing it received through Dynasty; (3) projected television advertising costs for those years; and (4) additional amounts for advertising Dynasty spas before termination and for Dynasty parts and equipment remaining in Water Quality's inventory. (We will refer to this fourth

---

[9] We recognize that the term "gross profits" is used in different ways, as indeed it is in this action. For our purposes the important point is to be clear in how we are using it. Including more or fewer costs in its meaning would change terminology but would not affect the substance of our analysis.

[10] As one of the witnesses for Dynasty testified, a floor-plan loan provides financing for retailers to purchase the spas.

category of damages as "additional losses.") The total damages from all four categories, $582,566, was reduced to a present value of $482,184. In addition, Dewitt testified that it was going to cost $40,000 to buy an outdoor sign to replace the Dynasty spa sign. This was not included in Karnitz's report.

¶ 51. At trial Karnitz removed some of the "additional losses." Also at trial, which took place in March 2009, Karnitz and Water Quality first learned that Dynasty had stopped offering the ninety-day interest-free financing at the end of 2008. Water Quality's counsel stated in closing argument that for this reason the interest projected for the years after 2008 should not be considered.

¶ 52. Dynasty's expert, also a certified public accountant, disagreed with Karnitz's manner of calculating gross profits, with the inclusion of any interest or television advertising, and with the inclusion of the "additional losses." It was his opinion that Water Quality was better off selling Catalina spas, one of the brands Water Quality began selling after termination, than it was selling Dynasty spas. Therefore, according to Dynasty's expert, Water Quality was not entitled to any damages.

¶ 53. We start our discussion of damages with the amount awarded, $264,800. We first conclude the jury could reasonably have decided to credit Dewitt's testimony that a spa sign to replace the Dynasty spa sign would cost $40,000 and could consider this a reasonable expense. We also conclude, in the absence of a developed argument to the contrary by Dynasty, that a reasonable jury could find that interest in the amount of $6,000 for

2008 was a reasonable expense.[11] This means that the other credible evidence must support $218,800 as a reasonable amount of damages. With this figure in mind, we turn to a consideration of the two largest components of the damages requested: the projected lost gross profits, $114,811 (not reduced to present value), and the projected cost of television advertising, $348,156 (not reduced to present value).[12]

¶ 54. Dynasty makes several objections to Karnitz's projection of lost gross profits.[13] At the outset, we will assume without deciding that Dynasty is correct that the per unit freight cost used in Karnitz's report for Dynasty spas and Master spas—$55—is incorrect

[11] Dynasty's challenge to the interest centers on the fact that Dynasty stopped offering the ninety-day interest-free financing after 2008. Dynasty's argument apparently ignores the fact that Water Quality conceded in closing that, for this reason, the jury should exclude from consideration the interest in Karnitz's report for the years after 2008 and award only $6,000. Dynasty tells us in its brief, "it is indisputable that Karnitzs report had at least a $40,000 error in favor of Water Quality relative to floor-plan interest," but Water Qualitys concession amounts to an even greater amount being excluded from consideration: the total amount of interest on Karnitz's report for the years 2009–2016 is $51,497.

[12] As already noted, Karnitz's report reduces the total of $582,566 to a present value, $482,184. However, it does not include present values for the categories of expenses that make up the total. We return to this point later in our opinion.

[13] Karnitz used the actual sales of replacement spas for 2008 as a basis for determining the projected gross profits through 2016 selling replacement spas. He estimated the sale of Dynasty spas Water Quality would have sold in 2008, had it not been terminated, by determining averages using Dynasty spa sales from January 1, 2005, to December 31, 2006; that 2008 estimate then became the basis for projecting through 2016.

and that the figures should be $122 and $85, respectively. This assumption reduces the projected lost gross profits by $20,815, from $114,811 to $93,996.[14] For the reasons explained below, we reject Dynasty's other arguments and conclude a reasonable jury could decide that $93,996 was a reasonable amount for projected lost gross profits (not reduced to present value).

¶ 55. Dynasty contends that the mix of replacement spas Karnitz used in his analysis—fourteen Master spas versus twelve Catalina spas, which was the actual number Water Quality sold in 2008—is based on an assumption that has no reasonable basis in the evidence. Dynasty asserts that Dewitt testified he had no present intention to continue buying Master spas. Using only Catalina spas, which have a significantly higher gross profit than Master spas and Dynasty spas, would result in higher projected gross profit figures for Water Quality and, therefore, reduce its future lost profits.

¶ 56. We disagree with Dynasty's characterization of Dewitt's testimony. Dewitt testified that he had not made up his mind which company's spas he was going to

---

[14] Using $122 instead of $55 for Dynasty spas, with the two percent increase per year beginning in 2010 that Karnitz used, decreases by $26,649 (not reduced to present value) the projected gross profits for the sale of Dynasty spas had Water Quality not been terminated. Using $85 for Master spas instead of $55, with the two percent annual increase beginning in 2010, decreases the gross profits from Master spas by $5,834 (not reduced to present value). The end result is a decrease of $20,815 (not reduced to present value) in the projected lost gross profits.

We do not address Dynasty's objection to Karnitz's method of determining the freight charges for Catalina spas because the resulting difference is de minimis.

be selling. He had experienced problems with Master spas that needed to be corrected before he would sell more of them, and, while he was "looking at Catalina," that company had a few problems, too. Dynasty emphasizes the evidence that, at the time of trial in March 2009, Water Quality had last ordered Master spas—seven—in June 2008, and since then had ordered Catalina spas—six—in 2008, and eight more the day before trial. Karnitz testified that he was aware that at the moment Water Quality was not selling Master spas but that it was undecided whether Dewitt might go back to them. This is consistent with Dewitt's testimony. We reject Dynasty's suggestion that the only reasonable assumption is that Water Quality will in the future sell Catalina spas to the exclusion of Master spas and to the exclusion of any other spa with a gross profit like that of Master spas and Dynasty spas. The jury was entitled to credit Dewitt's testimony that there were a few problems with Catalina and he was undecided on what spas Water Quality would sell. It was also entitled to decide that the 2008 overall gross profit was a reasonable basis for projecting lost future gross profits.

¶ 57. Dynasty also contends that Karnitz's calculations contradict the undisputed evidence because Karnitz ignored two Dynasty spas sold in 2008 and ignored Master spa sales in the latter half of 2007 that had higher gross profits than those sold in 2008. Despite the way Dynasty frames this argument, it is essentially a challenge to Karnitz's methodology. Karnitz testified that he did not include the two Dynasty spas because they were the last two of the Dynasty inventory that Water Quality had to get rid of and were not relevant to a projection of how many spas of replacement brands it would sell. He therefore used as a basis for the projection the actual sales of only the

replacement brands sold in 2008. He did not include any sales from 2007, the year of termination. The jury heard Karnitz's explanation for his methodology as well as Dynasty's criticism of it. It was the jury's role to choose whether to accept Karnitz's approach or not.[15]

¶ 58. Dynasty further asserts that Karnitz's projections do not establish *any* damages to a reasonable certainty because they do not take into account the 2008 recession, which, according to Dynasty, accounted for the lower number of sales of the replacement lines in 2008 and would have caused lower sales of Dynasty spas in 2008, even if Water Quality had not been terminated. Although there was evidence to support this position, there was also evidence that Wood County had felt the effects of the recession earlier than 2008; that certain spa markets were insulated from the national recession; that some customers bought spas despite harder economic times, seeing this as a less expensive alternative to family vacations; and that Dynasty experienced an eight percent increase in gross sales from 2007 to 2008. It was the jury's role to weigh all this evidence. The jury could reasonably decide that, notwithstanding the 2008 recession, the 2008 actual sales of replacement spas provided a reasonably certain basis for projecting the replacement spas Water Quality would sell in the future. It could also reasonably decide that, notwithstanding the 2008 recession, Water Quality's sales of Dynasty spas from July 1, 2005, to December 31, 2006, provided a reasonably certain basis for estimating the number of Dynasty spas Water Quality would have sold in 2008 had it not been terminated.

---

[15] Dynasty's challenge to an invoice for a Catalina spa depends on inferences from the evidence that are in Dynasty's favor and, because this is not consistent with our standard of review, we do not address it.

¶ 59. We next consider the projected costs for television advertising. Karnitz's report provided for $52,000 per year for 2008 and 2009, with a ten percent annual decrease thereafter. Dynasty contends that it is unreasonable to include any amount for television advertising because Dewitt testified that he did not do any television advertising in 2008 because he couldn't afford to. Dynasty also contends that Water Quality did not do any television advertising when it sold Dynasty spas and spent only $30,000 total on the advertising it did do during that time, and that the amount projected is unreasonably high compared to the projected sales.[16]

¶ 60. We agree with Dynasty that there is no credible evidence supporting television advertising as an expense in 2008. It is undisputed no amount was spent. Karnitz's testimony on this point explains why

---

[16] In this argument, Dynasty refers to its motion at the close of evidence that the court instruct the jury not to include in its award of damages any amount for advertising. (The jury had been instructed on the law before opening statements.) Dynasty argued that advertising would be for the purpose of restoring lost good will, which was relevant to damages based on lost business value, and Water Quality had elected to prove damages based on lost future profits. According to Dynasty, considering the cost of advertising in computing lost future profits results in a duplicitous damage award. Water Quality objected because no motion in limine had been brought on this ground, there had been no objection to admission of the evidence, and Water Quality had not had the opportunity to brief the issue. The court denied the motion, agreeing that it should have been brought up earlier. Dynasty does not argue that the court erroneously exercised its discretion in denying this motion. We therefore do not discuss this issue and assume the jury could consider the television advertising expenses as a component of damages if they were proved by the greater weight of the credible evidence to a reasonable certainty.

no television advertising was purchased in 2008 but does not explain why it is nonetheless reasonable to include it in computing lost profits for 2008. We therefore confine our attention to 2009 and subsequent years.

¶ 61. Dewitt's testimony provides a reasonable and credible basis for inferring that Water Quality had to take more intensive steps to advertise in order to counteract the negative impression created by Dynasty's termination of its relationship with Water Quality in favor of another business in the area. It is also reasonable to infer from his testimony that more intensive advertising was necessary to compete with that business, which had the advantage of good will in the Dynasty brand that Water Quality had built up.

¶ 62. Karnitz, who testified that he gives business advice to his clients and values businesses, opined that it was necessary to "get the word out" that Water Quality was no longer with Dynasty but had other lines; the initial figure of $52,000 was to "get people back in the door" and could be reduced thereafter.[17] He acknowledged this was a lot to spend and is higher than average for advertising, but in his opinion it makes sense to initially spend a lot on advertising when a dealership had been terminated. He also acknowledged that, even though the cost of television advertising projected for 2009 might appear to be out of proportion to the increase in gross profits projected for 2010, one does not expect the results of advertising to show up the next year; it has a long term benefit.

---

[17] The $52,000, according to Karnitz's report and testimony was based on a quote from television station WAOW for thirty-second commercials on the two evening news shows, twice a week. Dynasty does not dispute the accuracy of this quote.

¶ 63. Dynasty's expert acknowledged that, if a retailer's reputation is damaged, it would have an impact on its ability to sell spas and it might need to advertise more than in the past to rehabilitate its reputation. He testified that on average a retailer would spend about five percent of gross sales on advertising. We also consider the deposition testimony of Dynasty's president, read into evidence at trial, that his company recommends television and newspaper advertising to its dealers.

¶ 64. The above evidence provides a credible basis for the jury to reasonably decide that a substantial amount for television advertising was a reasonable expense for 2009, with reductions as projected thereafter. We need not decide whether, as Dynasty contends, $52,000 as an initial amount is unreasonably high. This is not necessary because we conclude a reasonable jury could decide on a lesser amount that is reasonable and supports the amount of damages awarded. We reach this result for the following reasons.

¶ 65. A jury could reasonably decide that Water Quality would spend above the average percentage of gross sales in advertising because of the need to overcome the negative effect of losing the dealership and establish itself as selling other lines of spas. If, for example, the jury decided that ten percent (rather than the average five percent) of gross sales was reasonable, this would mean $25,000 in 2009.[18] If this same amount were spent annually the total would be $200,000 for the years 2009–2016. We recognize this is not reduced to present value, just as the $93,996 for lost future gross profits is not reduced to present value. However, when

---

[18] There was testimony that at least $250,000 of Water Quality's gross sales were from spas.

756

we add the two figures and compare the total, $293,996, to the $218,800 remaining to be proved, we conclude a reasonable jury could decide that the difference is adequate to account for a reduction to present value. As the jury was instructed, mathematical precision is not required and future lost profits, by their very nature, "cannot be definitely determined." *See* WIS JI—CIVIL 3725.

¶ 66. There are undoubtedly other ways for a jury to arrive at the award of $264,800 based on the credible evidence, but this example persuades us there is at least one way the jury could do so. Because of this conclusion, it is unnecessary to address Dynasty's objections to the "additional losses."

¶ 67. Finally, we consider Dynasty's contention that Water Quality did not prove net profits as required by *Lindevig*, 150 Wis. 2d 731. Dynasty contends that Water Quality had to prove and compare the expenses of floor-plan interest, deal sweeteners, delivery expenses, and costs of labor, and these would reduce the lost net profits. We do not agree that *Lindevig* requires this.

¶ 68. In *Lindevig*, a dealer whose dealership had been wrongfully terminated for a period of time sought to prove past lost profits based on the evidence of his gross sales for the year before and the year after the period in question and on his testimony that he had a gross markup of thirty-five percent. He introduced no evidence of expenses. We concluded this was insufficient because gross receipts are insufficient to prove lost profits and there was no evidence of expenses, although the dealer testified he had books that showed the expenses. *Id.* at 738–40.

¶ 69. Water Quality is not attempting to prove lost profits from evidence of gross sales, and it is not

trying to prove lost past profits, but lost future profits. *Lindevig* does not specify the expenses that must be proved in this situation. It is well established that overhead costs or costs that remain fixed regardless of whether Water Quality continued to sell Dynasty spas or had to switch to selling other brands do not need to be proved because they do not affect the existence or amount of Water Quality's lost profits. *See Schubert v. Midwest Broad. Co.*, 1 Wis. 2d 497, 503–04, 85 N.W.2d 449 (1957).

¶ 70. The gross profit figure in this case, as we have defined it, is the result of deductions for the cost of the spas and the freight costs. With respect to interest, because Dynasty terminated its financing program, Water Quality would have had to obtain other financing had it continued to sell Dynasty spas, and it is reasonable to infer it would have obtained the same bank financing that it did obtain. We see no basis in the record for inferring that there would be fewer "deal sweeteners" offered after termination or that there would be a savings to Water Quality in the expenses of delivery. As for reduced labor costs, Dynasty cites to the summary judgment record, not to trial testimony, and we therefore do not consider this. As the jury was instructed, "[i]t [is] enough if the evidence shows the extent of the damages as a matter of just and reasonable estimation, although the result may only be approximate." *See* Wis JI—Civil 3725.

V. New Trial in the Interest of Justice on Damages

¶ 71. Dynasty asks for a new trial in the interest of justice, contending that the damages are excessive and against the great weight and clear preponderance of the evidence. The arguments on this point are, in

essence, the same as those we have already rejected. Accordingly, we see no basis for ordering a new trial on damages.

## CONCLUSION

¶ 72. For the reasons stated above, we affirm the jury's finding of a dealership under the WFDL and the jury's award of damages.

*By the Court.*—Judgment and order affirmed.